UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELIZABETH LIGHTFOOT, *et al.*,<br><br>        Plaintiffs,<br><br>        v.<br><br>DISTRICT OF COLUMBIA, *et al.*,<br><br>        Defendants. | Civil Action No. 01-1484 (CKK) |

**MEMORANDUM OPINION**
(January 28, 2005)

Plaintiffs in this case are members of a class of former and current District of Columbia employees whose disability compensation benefits were terminated, suspended, or reduced by the District of Columbia, its officials, and a third-party administrator.  Plaintiffs brought the above-captioned action alleging, *inter alia*, that (1) Defendants' failure to adopt written and consistently applied standards, policies, and procedures governing the termination, suspension, and modification of their benefits violated the Due Process Clause; and (2) Defendants' implicit adoption of unwritten practices regarding the termination, suspension, and modification of Plaintiffs' disability benefits without publishing notice in the *District of Columbia Register* and without public comment violated the District of Columbia Administrative Procedure Act ("DCAPA").  In order to obtain judicial resolution as to these claims, Plaintiffs previously filed a Motion for Partial Summary Judgment concerning Counts VI and VII contained within their Third Amended Complaint.  This Court, in a Memorandum Opinion and Order dated September 24, 2004, granted Plaintiffs' Motion for Partial Summary Judgment and found that Defendants' system of inadequate notice and insufficient process contravened both the fundamental

guarantees of Due Process and the restrictions created by the DCAPA.  *See Lightfoot v. Dist. of Columbia*, 339 F. Supp. 2d 78 (D.D.C. 2004).

Currently pending before the Court is Government Defendants' Motion For Reconsideration, or to Alter or Amend the Order of September 24, 2004, or, in the Alternative, for Clarification of Such Order ("Motion to Reconsider").  Upon consideration of the Government Defendants' Motion to Reconsider, Plaintiffs' Opposition, Government Defendants' Reply, Government Defendants' Notice Regarding Supplemental Authority, Plaintiffs' Response, and the entire record herein, the Court shall deny Government Defendants' Motion to Reconsider.

## I: BACKGROUND

On July 6, 2001, Plaintiffs filed this action, initially seeking a preliminary injunction to reinstate their previously-denied disability benefits and to enjoin any future termination of benefits until the District of Columbia instituted a more thorough pre-termination process.  In a Memorandum Opinion dated October 29, 2001, this Court, while finding a likelihood of success on the merits, denied Plaintiffs' Motion for a Preliminary Injunction for failure to establish irreparable injury.  *Lightfoot v. Dist. of Columbia*, Civ. No. 01-1484, at 21, 29 (D.D.C. Oct. 29, 2001) (memorandum opinion and order denying preliminary injunction).

After a series of amendments and discovery-related motions, Plaintiffs filed a Third Amended Class Action Complaint on January 22, 2003.  Third Amended Class Action Complaint for Declaratory and Injunctive Relief ("Third Am. Compl.").  Named as Defendants were the District of Columbia, and the following who were sued in their official capacities as employees of the District of Columbia:  Anthony Williams, Mayor of the District of Columbia;

2

Gregory P. Irish, Director of the District of Columbia Department of Employment Services;

Milou Carolyn, Director of the District of Columbia Office of Personnel; and James Jacobs,

Director of the District of Columbia Office of Risk Management (collectively, the "Government

Defendants").  Third Am. Compl. at ¶¶ 10-14.  Also named as a Defendant was CLW/Creative

Disability Management ("CLW/CDM"), a private entity with which the District has contractually

delegated the power to make determinations on disability compensation claims and to terminate,

suspend, or modify existing benefit awards.  *Id.* at ¶ 15.

In a ruling issued on January 14, 2004, this Court, over Defendant CLW/CDM's

objections, approved Plaintiffs' Renewed Motion for Class Certification under Rule 23 of the

Federal Rules of Civil Procedure.  *Lightfoot*, Civ. No. 01-1484, at 19 (D.D.C. Jan. 14, 2004)

(memorandum opinion and order granting plaintiffs' motion for class certification).  As such, the

six named plaintiffs now represent a class that constitutes:

> All persons who have received or will receive disability compensation benefits
> pursuant to D.C. Code § 1-623.1, *et seq.* and whose benefits have been
> terminated, suspended or reduced since June 27, 1998 or whose benefits may be
> terminated, suspended or reduced in the future.  "Disability compensation
> benefits" is defined to exclude a scheduled award provided in D.C. Code § 1-
> 623.7 expiring at the end of the statutory term, continuation of pay provided in
> D.C. Code § 1-623.18(a) expiring at the end of the statutory term, funeral
> expenses provided in D.C. Code § 1-623.34, a fully paid lump sum settlement
> provided in D.C. Code § 1-623.35, and credited compensation leave provided in
> D.C. Code § 1-623.43.

*Id.* at 4 (quoting Pls.' Renewed Mot. for Class Certification at 1).

After a series of unsuccessful settlement negotiations, the Court addressed Plaintiffs'

Motion for Partial Summary Judgment concerning two counts contained within the Third

Amended Complaint.   Count VI alleges that Defendants' failure to adopt written and

consistently applied standards, policies and procedures governing the termination, suspension, and modification of disability compensation benefits violates the Due Process Clause of the Fifth Amendment of the United States Constitution.  Third Am. Compl. at ¶ 142.  Count VII alleges that the Government Defendants' implicit adoption of unwritten practices regarding the termination, suspension, and modification of disability benefits without publishing notice in the *District of Columbia Register* and without public comment violates D.C. Code § 2-505.  *Id.* at ¶ 144.

The Court, in a Memorandum Opinion and Order issued on September 24, 2004, granted Plaintiffs' Motion for Partial Summary Judgment as to Counts VI and VII.  *Lightfoot*, 339 F. Supp. 2d at 92, 95-96.  Essentially, the Court's ruling consisted of two major holdings:  First, the Court found that Defendants' system of vague, unwritten "best practices" employed under the current Disability Compensation Program ("the Program") provides "insufficient notice, opaque standards of review, and undetectable procedure" to such a degree that it violates the strictures of Due Process.  *Id.* at 91.  The Court identified specific considerations that Defendants should evaluate in issuing written guidelines to "make the 'implicit' explicit and provide stakeholders with transparent guidelines and accountable administration."  *Id.*  at 92.  Second, the Court concluded that the policies regarding eligibility for the disability benefit program constitute "rules" as defined by the DCAPA.  *Id.* at 93.  Because "Defendants' reliance on unwritten 'best practices' and unpublished procedures to guide the Disability Compensation Program constitutes rule-making under the DCAPA," *id.* at 95, the Court found that Defendants failure to follow the notice and comment procedures outlined in D.C. Code § 2-505(a) renders those rules unlawful, *id.* at 96.

4

In the "Remedy" section of its September 24, 2004, Opinion and Order, the Court ordered that "the disability compensation benefits, both cash and medical, of all members of the Plaintiff class be reinstated as of the date of this Opinion and Order until individualized termination, modification, or suspension determinations may be made under validly promulgated rules." *Id.* While its ruling dealt with prospective relief for the class members, the Court reserved a ruling on possible retrospective relief, referring the parties to Magistrate Judge Facciola for possible resolution of "the issue of possible retroactive relief for Plaintiffs to recover monies for the period stretching from the date of the termination, modification or suspension of their benefits to the date of" the September 24, 2004 Opinion and Order. *Id.*

On October 6, 2004, Plaintiffs moved for an order requiring the District of Columbia to identify all class members and, in cooperation with Plaintiffs, arranging for their notification of the lawsuit and the Court's September 24, 2004, Opinion and Order. Pls.' Mot. for an Order Providing Notice to All Class Members. The Court, in an Order on November 3, 2004, referred this motion to Magistrate Judge Facciola for a Report and Recommendation to aid in the resolution of this complex issue. *Lightfoot*, No. 01-1484 (D.D.C. Nov. 3, 2004) (minute order referring Plaintiffs' motion for order providing notice to all class members to Magistrate Judge).

Subsequent to the Court's September 24, 2004, ruling, Government Defendants filed two motions on October 8, 2004, in an effort to forestall the consequences of the Court's holding. First, Government Defendants moved this Court for reconsideration and to alter or amend its Order, pursuant to the Court's authority and Rules 59(e) and 60(b) of the Federal Rules of Civil Procedure, and, to the extent that the Court did not reconsider, alter, or amend its order, for clarification thereof pursuant to this Court's authority and Rules 58(a) and 60(a) of the Federal

Rules of Civil Procedure.  *See* Gov't Defs.' Mot. to Reconsider.  Second, pursuant to Federal

Rule of Civil Procedure 7(b) and Local Civil Rule 7.1, Government Defendants moved

contemporaneously to stay the Court's September 24, 2004, Order pending a decision on the

Motion to Reconsider.  *See* Gov't Defs.' Mot. to Stay.

## II: LEGAL STANDARD

While Government Defendants provide extensive briefing in their effort to re-litigate the

conclusions of this Court in its September 24, 2004, Opinion and Order, they provide little

connection between their arguments and the rather narrow parameters governing motions for

reconsideration under Rules 59(e) and 60(b) of the Federal Rules of Civil Procedure.  The

standards governing a motion for reconsideration under Federal Rule of Civil Procedure 60(b)

are somewhat more restrictive than those governing Federal Rule of Civil Procedure 59(e).  *See*

*United States v. Pollard*, 290 F. Supp. 2d 153, 156-58 (D.D.C. 2003).  In relevant part, Federal

Rule of Civil Procedure 60(b) provides:

> On motion and upon such terms as are just, the court may relieve a party or a
> party's legal representative from a final judgment, order, or proceeding for the
> following reasons:  (1) mistake, inadvertence, surprise, or excusable neglect; (2)
> newly discovered evidence by which due diligence could not have been
> discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether
> heretofore denominated intrinsic or extrinsic), misrepresentation, or other
> misconduct of an adverse party; (4) the judgment is void; (5) the judgment has
> been satisfied, released, or discharged, reversed or otherwise vacated, or it is no
> longer equitable that the judgment should have prospective application; or (6) any
> other reason justifying relief from the operation of the judgment.

Fed. R. Civ. P. 60(b).

The general rule is that a motion for reconsideration is treated as a "[Fed. R. Civ. P.]

59(e) motion if filed within 10 days of entry of the challenged order and as a Rule 60(b) motion

if filed thereafter." *Pollard*, 290 F. Supp. 2d at 156 (quoting *United States v. Clark*, 984 F.2d 31, 32 (2d Cir. 1993)); *see also Derrington-Bey v. Dist. of Columbia Dep't of Corrections*, 39 F.3d 1224, 1225-27 (D.C. Cir. 1994) (same); *cf.* Fed. R. Civ. P. 59(e) ("Any motion to alter or amend a judgment shall be filed no later than 10 days after entry of the judgment.").  While over 10 calendar days passed between the entry of the Court's September 24, 2004, Memorandum Opinion and Order and Government Defendants' Motion to Reconsider filed on October 8, 2004, calendar days are not controlling.  Instead, Rule 6(a) of the Federal Rules of Civil Procedure dictates:  "When the period of time prescribed or allowed is less than 11 days, intermediate Saturdays, Sundays, and legal holidays shall be excluded in the computation." Fed. R. Civ. P. 6(a); *see also Piper v. Dep't of Justice*, 312 F. Supp. 2d 17, 21 n.1 (D.D.C. 2004).  Because Government Defendants' filed their Motion to Reconsider on Friday, October 8, 2004, less than 10 days -- as computed by Federal Rule of Civil Procedure 6(a) -- had passed between the filing and the Court's Order of Friday, September 24, 2004.  As such, the relevant standard under which to adjudicate Government Defendants' Motion to Reconsider is Federal Rule of Civil Procedure 59(e).

"The district court has considerable discretion in ruling on a Rule 59(e) motion." *Piper*, 312 F. Supp. 2d at 20 (citing *Rann v. Chao*, 209 F. Supp. 2d 75, 78 (D.D.C. 2002).  Importantly, "[a] motion pursuant to Fed. R. Civ. P. 59(e) to alter or amend judgment after its entry is not routinely granted." *Harvey v. Dist. of Columbia*, 949 F. Supp. 878, 879 (D.D.C. 1996). "Motions under Fed. R. Civ. P. 59(e) are disfavored and relief from judgment is granted only when the moving party establishes extraordinary circumstances." *Niedermeier v. Office of Baucus*, 153 F. Supp. 2d 23, 28 (D.D.C. 2001).

7

"Rule 59(e) motions 'need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct clear error or manifest injustice.'" *Anyanwutaku v. Moore*, 151 F.3d 1053, 1057 (D.C. Cir. 1998) (quoting *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (per curium)).  Rule 59(e) motions are not granted if the court suspects the losing party is using the motion as an instrumentality for arguing the same theory or asserting new arguments that could have been raised prior to final judgment.  *Taylor v. Dep't of Justice*, 268 F. Supp. 2d 34, 35 (D.D.C. 2003) (citing *Kattan v. Dist. of Columbia*, 995 F.2d 274, 276 (D.C. Cir. 1993) (citations omitted)).  Indeed, the law is clear that a "Rule 59(e) motion is not a second opportunity to present argument upon which the Court has already ruled, nor is it a means to bring before the Court theories or arguments that could have been advanced earlier."  *W.C. & A.N. Miller Co.'s v. United States*, 173 F.R.D. 1, 3 (D.D.C. 1997), *aff'd sub nom. Hicks v. United States*, No. 99-5010, 1999 WL 414253 (D.C. Cir. May 17, 1999); *see also New York v. United States*, 880 F. Supp. 37, 38 (D.D.C. 1995) ("Rule 59(e) motion to reconsider is not simply an opportunity to reargue facts and theories upon which a court has already ruled.").  It is well-established that Rule 59(e) motions "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment."  11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2810.1 at 127-28 (2d ed. 1995).

### III:  DISCUSSION

Government Defendants make four central arguments to bolster their Motion to Reconsider:  (1) the Court's findings of fact concerning the Disability Compensation Program's written instruments are clearly erroneous; (2) the Court's legal findings relating to Due Process

exceed any constitutional requirements and should be reconsidered; (3) the Court's legal findings

relating to the DCAPA are erroneous and should be reconsidered; and (4) the Court's

reinstatement of all class members to the Program, without individualized determinations of

entitlement to benefits, is contrary to the controlling authority and should be reconsidered.  Gov't

Defs.' Mot. to Reconsider at 1-2.  Importantly, Government Defendants raised their first three

arguments previously, and all were summarily rejected by the Court; in their current Motion to

Reconsider, Government Defendants offer no argument as to an intervening change of

controlling law and no new evidence for the Court to consider.  As to their fourth argument, that

the Court's prospective remedy was contrary to controlling authority, Government Defendants

had an opportunity to raise this argument in the previous round of filings, explicitly failed to do

so, and effectively conceded this point.  *See Lightfoot*, 339 F. Supp. at 96 n.13 ("This point was

well-briefed by Plaintiffs.  *See* Pls.' Mem. at 12-14; Pls.' Reply to Opp'n of Gov't Defs. to Pls.'

Mot. for Summ. J. at 11-12.  In its briefing, the Government chose not to respond to this issue.

Having reviewed the cases proffered by Plaintiffs, the relevant filings, and additional research,

the Court makes its findings.").

  Despite these abject failures by Government Defendants, the Court will briefly consider

each contention in order to highlight the fact that their arguments are just as groundless in their

substance as they are procedurally inappropriate.  Before beginning, the Court notes that the only

possible basis upon which Government Defendants may substantiate their Rule 59(e) motion is

under the "need to correct clear error or manifest injustice" standard.  *Firestone*, 76 F.3d at 1208.

While "[c]ourts have generally not defined what constitutes 'clear error' under Rule 59(e),"

*Piper*, 312 F. Supp. 2d at 21, "clear error" should conform to a "very exacting standard," *id.*

(quoting *Oneida Indian Nation of New York v. County of Oneida*, 214 F.R.D. 83, 98 (N.D.N.Y.

2003) (quoting *Hopwood v. Texas*, 236 F.3d 256, 272 (5th Cir. 2000))).  Indeed, district courts

should have "a clear conviction of error" before finding that a final judgment was predicated on

clear error.  *Id.* (citing *Oneida Indian Nation of New York*, 214 F.R.D. at 98).  As the Seventh

Circuit noted, a final judgment must be "dead wrong" to constitute clear error.  *Parts & Elec.*

*Motors, Inc. v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir. 1988).  While the "manifest

injustice" standard is even more vague than "clear error," *Piper*, 312 F. Supp. 2d at 22-23, it can

be said that "manifest injustice does not exist where, as here, a party could easily have avoided

the outcome, but instead elected not to act until after a final order had been entered."  *Ciralsky v.*

*CIA*, 355 F.3d 661, 673 (D.C. Cir. 2004) (internal quotations omitted); *see also Piper*, 312 F.

Supp. 2d at 23 ("The Court does not find anything 'manifest' about the possible 'injustice' that

may result from the Government's prior inaction that would compel the Court to disturb its

original judgment.").  With an understanding of this framework, the Court shall proceed to

analyze the failings of Government Defendants in their quixotic quest to re-litigate the same

issues under the same facts and avoid the finality of judgment.[1]

---

[1] The Court notes that in their new set of filings, Government Defendants periodically
make two kinds of baseless assertions:  (1) that Plaintiffs did not dispute certain facts in the
previous round of motions, *see, e.g.*, Gov't Defs.' Mem. at 9 & n.13 ("plaintiffs failed to dispute
that the eligibility process is properly the subject of 'best practices,' which, by their nature are
largely unwritten"; "Plaintiffs did not dispute any of the facts we identified concerning the use of
best practices"); and (2) that the Court somehow did not accept certain undisputed facts relating
to unwritten, inaccessible "best practices," *see, e.g.*, Gov't Defs.' Mem. at 9 n.11 ("to the extent
that the Court's decision does not accept all facts pertaining to the use of best practices to be
undisputed, its findings are clearly erroneous").  Both claims are without merit, and are
contradicted by the clear record in this case.  To the extent that certain facts were not disputed,
they were not material.  Moreover, what Government Defendants label "facts" regarding "best
practices" are often *legal conclusions*.  *See, e.g.*, Gov't Defs.' Opp'n to Pls.' Mot. for Partial
Summ. J., Ex. 1 (Dailey Decl.) at ¶ 14 ("In my opinion . . . specific rules telling adjusters how to

A.      *The Absence of Clear, Published Standards Governing the Program Fails to Satisfy Due Process.*

The Court's September 24, 2004, Opinion and Order recognized the general failure of the District of Columbia to provide clear, published standards guiding the termination, suspension, and modification of disability benefits.  As the Court pointed out, "Defendants' repeated citations to any and all possible sources that happen to capture some reference to the Disability Compensation Program are unavailing; virtually every written instrument raised by Defendants contains minimal or no reference to the termination, modification or suspension processes *and* is not accessible to the disability benefit stakeholders whose interest in such guidelines is paramount."  *Lightfoot*, 339 F. Supp. 2d at 91 (emphasis in original).  The Court found that Defendants might well be able to meet the requirements of Due Process if they "are able to articulate their 'best practices' and other rules regarding termination, suspension or modification of benefits in writing and in a manner accessible to both the public and interested stakeholders."  *Id.* at 91-92.  In its conclusion, the Court urged Defendants to "*strongly consider* including

make eligibility decisions, in lieu of using best practices, is not necessary, desirable, or legally required.").  Plaintiffs have clearly contested Government Defendants' attempts to turn legal conclusions into facts, and the Court has found Government Defendants' legal conclusions to be inaccurate.  Further, as Plaintiffs have consistently pointed out and the Court has recognized, many of Government Defendants' "facts" concerning their previous system of notice and use of "best practices" are contradicted by both the various Notices over the relevant time period provided by the parties as exhibits and the deposition testimony of Defendants' own witnesses.  *Compare* Dailey Decl. at ¶ 12 (best practices are "national standards" that reflect "well-established methods") *with* Pls.' Opp'n to Defs.' Mot. to Reconsider, Ex. 2 (Dailey Dep.) at 219:1 - 220:8 (best practices do differ between public and private entities) *and Lightfoot*, 339 F. Supp. 2d at 82 n.1 (quoting former Head of Office of Risk Management Jacobs as stating in his deposition that "best practices" "*vary depending on who was doing the analysis of best practices*").  Finally, the Court and Plaintiffs have always recognized that a certain amount of "professional judgment" and expertise is required by Defendants in making termination, suspension, or modification decisions, but that discretion should be cabined by clear rules properly provided to stakeholders that are consonant with both Due Process and local law.

explicit written guidelines" relating to eleven relevant considerations:

- What regular opportunities do beneficiaries have to provide medical or vocational information to a claims adjuster prior to a decision to terminate, suspend or modify disability benefits?

- What are the protocols that govern the independent medical evaluation -- when, why, and where one is performed -- and the content of the resulting report?

- What weight is assigned to the independent medical evaluation vs. the opinion or the treating physician, and does the treating physician have an opportunity to comment on the independent medical evaluation before a decision is made?

- Does the beneficiary have the right to access his/her file before the termination decision?  What deadlines must the third party administrator follow once file access is requested?

- May a terminated beneficiary retain counsel, and does their attorney have the same right to review the beneficiary's file in order to prepare necessary argument?

- What standards are employed in making the termination decision, and what weight is afforded each piece of information before the adjuster?

- What standard of review is employed on reconsideration and appeal?

- What is the specific timeline for reconsideration and appeal?

- Are there extensions of time for good cause if a personal or other emergency prevents a beneficiary from responding to a termination notice in the outlined time period?

- What kinds of information may beneficiaries submit in response to a notice that their benefits will be terminated?

- Under what circumstances are benefits paid pending reconsideration subject to recoupment, and what are the procedures by which a beneficiary may seek a waiver?

*Id.* at 92 (emphasis added).  Importantly, the eleven considerations listed by the Court were not strict requirements that the Court was both expecting and compelling Government Defendants to follow.  The Court's September 24, 2004, Opinion and Order clearly did not dictate the exact,

explicit, written information that must underpin the Program to constitute adequate notice and

fair procedure.  The Court, rather than making a merits-based determination of the precise

content that the Program must reproduce in published, accessible writings, instead listed a series

of questions that the previous systems of notice had failed to answer.  The Court noted that these

general considerations "should" be "considered" as indicia that will aid in Government

Defendants' quest to satisfy Due Process.  *Id.*  With these kinds of "small changes to the current

system" which lacks most, if not all, of these types of explicit guidelines, the Court noted that

Defendants might well be able to "provide the requisite notice and accountability essential for

fair process."  *Id.*

   In their Motion to Reconsider, Government Defendants simply reiterate and expand their

previously discarded argument that "[c]urrent Program procedures that do not implicate the

exercise of professional judgment and about which claimants have a need to know are both

already in writing and provided to claimants with sufficient time for them to make informed

decisions about their claims."  Gov't Defs.' Mem. at 2.  Notably, in its previous round of filings,

Government Defendants relied almost entirely on an argument that unwritten "best practices"

were sufficient to satisfy Due Process concerns.  Government Defendants were forced to rely on

these unwritten practices largely because the structure and parameters of the benefit modification

process for the Program were admittedly almost entirely unwritten.  *Lightfoot*, 339 F. Supp. 2d at

82.  The Court, upon an examination of the record before it, found that "virtually the only paper

-- or guidelines -- that will ever be seen by the Program's beneficiaries and for which Defendants

will be held accountable by the public is the TOB ["Termination of Benefits"] notice itself."  *Id.*

at 83 (citing Gov't's Opp'n to Pls.' Stmt. of Mat. Facts, Ex. 7 (TOB Notice)).  An analysis of the

TOB Notices provided by Government Defendants reinforced many of the inadequacies of its disability benefit termination, suspension, or modification regime, as it was evident to the Court upon an examination of the record that the typical TOB Notice failed to include:

> (1) a description of the evidence reviewed in reaching the decision, (2) the legal or evidentiary standard by which the decision is made, (3) guidance on the nature of reconsideration review, (4) the types of evidence or argument acceptable in connection with that review, and (5) notice that the beneficiary may obtain legal representation.

*Id.* Government Defendants now attempt to reverse course and highlight the "wealth" of new, improved "writings" that allegedly more fully describe the Program's procedures.

In their Motion to Reconsider, Government Defendants' note that "undisputed evidence" establishes that the Program directed Defendant CLW/CDM in July 2002 "to begin using a new notice in connection with decisions to terminate claimants." Gov't Defs.' Mem. at 3. In its directive to CLW/CDM, the District of Columbia stated:

> You will note a blank space in the notice for detailed reasons for our decision to terminate claim payments. Please be guided by the purpose of the law and the need to give some reasonable direction to the claimant regarding the basis for our decision . . . . [T]he blank space on the form should be used to provide a brief, clear description of the status of the underlying causative medical condition and/or the compliance with the required procedures, with supporting information referenced (and underlined attached if and to the extent possible). Naturally, the size of many files makes it impractical to summarize the claim examination process in the notice. In that event, the examiner must provide summary statements along the lines outlined in this paragraph. Alternatively, a brief, clear description of any procedural reason(s) for termination should be included in the blank space in the event of such a termination.

Gov't Defs.' Opp'n to Pls.' Mot. for Partial Summ. J., Ex. 7 (July 11, 2002, Letter to Art Bjorlykke, CLW/CDM and sample Notice of Termination of Benefits). According to Government Defendants, CLW/CDM initially questioned this directive, but "it appears to have

been fully implemented, no later than October 2002." Gov't Defs.' Mem. at 4 n.3.

Government Defendants now assert that the post-October 2002 TOB Notices meet the Court's concerns. However, of the five specific deficiencies with the TOB Notice identified by the Court in its September 24, 2004, Opinion and Order, Government Defendants attack just two -- the Court's third identified flaw, "guidance on the nature of reconsideration review," and its fourth identified flaw, "the types of evidence or argument acceptable in connection with that review." *Id.* at 4-5. As to the fourth identified flaw, Government Defendants direct the Court's attention to a section in the TOB notice directing a claimant to "submit all documents, information, medical reports and related material to support your position," and "specifically state why you believe your claim should remain open with continuing payments." *Id.* & Ex. 1 (TOB Notices). As to the third identified flaw, Government Defendants note that the TOB Notice "clarifies the distinction between reconsideration and appeal with respect to the continuation of benefits pending a decision," it explains the mailing requirements to institute an effective appeal, and it "reminds claimants that they may contact the TPA to review the files pertaining to their claims." *Id.* at 5.

Based upon these considerations related to the TOB Notice, as well as information provided in the Request For Proposal ("RFP") issued to bidders for the Third-Party Administrator ("TPA") contract, the District of Columbia Compensation Act ("DCA"), D.C. Code §§ 1-623, *et seq.*, and existing caselaw (including the treating physician's rule), Government Defendants assert that the present writings "defining" the framework for termination, suspension, or modification of disability benefits are both adequate and sufficiently

available to satisfy Due Process concerns.  Gov't Defs.' Mem. at 5-7.[2]  While the Court admits

that the development of the TOB Notice system is certainly an improvement, especially when

compared to the woefully inadequate previous notices, *see* Pls.' Mot. for Preliminary Injunction,

Ex. 1-4, four major problems exist with Government Defendants' argument.[3]

First, Plaintiffs' lawsuit concerns the period stretching from July 27, 1998, to present.

*See Lightfoot*, No. 01-1484, at 4 (D.D.C. Jan. 14, 2004) (memorandum opinion and order

granting plaintiffs' motion for class certification).  While Government Defendants claim that the

TOB Notice system was in place by October 2002, it is undisputed that in December 2002, the

---

[2] Government Defendants do concede, however, that the level of detail in its current notices informing claimants of reductions or suspensions of their benefits falls well beneath the information provided by a TOB Notice.  Gov't Defs.' Mem. at 6 n.9 (citing to Ex. 2-3). Specifically, these notices provide significantly less detail regarding reconsideration.  *Id.* Government Defendants suggest that any deficiencies are permitted under *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), because Plaintiffs' "private interest" is not impacted to the same degree as a termination and "there is nothing to suggest that the risk of erroneous deprivation is greater in these circumstances than in cases of termination."  *Id.*  Moreover, Government Defendants suggest that the Government's interest is greater in these circumstances, given its need to adjust benefits to appropriate levels as the claimant's entitlement changes and to enforce a claimant's obligation to cooperate with the Program.  While this argument is not particularly relevant for the purposes of this motion and was not discussed as part of Plaintiffs' Motion for Partial Summary Judgment, the Court notes several basic problems with Government Defendants' claim vis-á-vis notice for reductions and suspensions.  First, the affected private interest is still great; for instance, a suspension is effectively a temporary termination -- an approximate equivalent.  Essentially, Government Defendants embrace the fallacy of mistaking a difference in degree with a difference of kind.  Second, the risk of erroneous deprivation remains constant with that of a termination decision, and Government Defendants have offered no evidence to the contrary.  Third, providing individuals whose entitlements will be reduced or suspended the same kind of *notice* as those who will be terminated creates minimal to no additional cost to Defendants -- especially if the Program's procedural and substantive rules regarding disability benefit termination, suspension, or modification are written and published as required by Due Process and the DCAPA.

[3] The Court does note that a review of all TOB Notices submitted by Defendants indicates a wide variance in the length and quality of the discussion regarding the termination, modification, or suspension decision in each individual TOB Notice.

District of Columbia sent CLW/CDM a notice to cure the breach of its contract on the grounds

that it failed to use the notice. Third Am. Compl. at ¶ 43. In the Second Declaration of Phyllis

L. Dailey, Claims Bureau Manager of the Office of Risk Management for the District of

Columbia, Ms. Dailey points out that the TOB Notices provided to the Court by Government

Defendants as part of their Motion to Reconsider were only "issued in the past 12-18 months."

Gov't Defs.' Mot. to Reconsider, Ex. 1 (Second Dailey Decl.) at ¶¶ 6-9. As such, the provided

TOB Notices only cover the period running from the Spring of 2003 to present. Given this

evidence, it is unclear exactly when Government Defendants' prized TOB Notice system was

fully operational. However, by only focusing on the TOB Notice regime, whenever it truly

began, and ignoring the previous systems of notice that affected Plaintiffs, Government

Defendants are essentially conceding the Due Process failings of their disability benefit

termination, suspension, and modification regime for -- at least -- the 4.5 years stretching from

July 1998 to October-December 2002.[4]

---

[4] Named Plaintiffs largely dealt with the system previous to the TOB Notice regime, and have consistently argued that they suffered harm from the lack of notice and fair process provided them. These considerations make Government Defendants' contention that the named Plaintiffs of this class somehow "lack standing to obtain injunctive relief requiring the program to modify discretionary aspects of eligibility decision-making," Gov't Defs.' Mem. at 7-8, even more off-base. Government Defendants assert that "the record does not support the entry of injunctive relief requiring defendants to modify" any possible deficiencies in the fact-finding component of the eligibility decision process, "such as a suggestion that a claims adjuster improperly weighed evidence, failed to abide by best practices, or ignored legal standards." *Id.* This argument is wholly irrelevant for the purposes of the present Motion to Reconsider and represents further evidence that, as the Court pointed out earlier, "Defendants fundamentally misunderstand Plaintiffs' claim." *Lightfoot*, 339 F. Supp. 2d at 90. The fact-intensive question of whether Plaintiffs were provided arbitrary and inconsistent individualized eligibility determinations is not before the Court at this time, and may well be a subject of later briefing. Instead, the Court's September 24, 2004, Opinion and Order and this Order are focused on the "purely legal" issue of whether the requirements of notice and "the potential for arbitrary decision-making" requires actual written publication and greater overall notice than the

17

<u>Second</u>, Government Defendants' (over)-reliance on the reforms instituted through the TOB Notice system is misplaced given the inherent limitations of the TOB Notice itself.  The TOB Notice does not set forth *any* procedures that the Program should strongly consider following in connection with the *initial* termination decision.  *See* Gov't Defs.' Mem., Ex. 1. Rather, the TOB Notice is focused purely on reconsideration review.  *Id.*  Of the Court's checklist of eleven Due Process/notice concerns, *Lightfoot*, 339 F. Supp. 2d at 92, the recent TOB Notices submitted by Government Defendants arguably satisfies only one of the considerations.  In response to the Court's suggestion that Defendants should consider explicit written guidelines relating to "What kinds of information may beneficiaries submit in response to a notice that their benefits will be terminated?", the TOB Notice provides a sweeping, non-specific answer:  "all documents, information, medical reports and related material."  Gov't Defs.' Mem., Ex. 1.  Problematically, even this general answer does not appear to conform with Defendants' existing practices:  James Jacobs, former Head of the Office of Risk Management, admitted in deposition that only documents pre-dating the termination decision would be considered.  Pls.' Opp'n to Gov't Defs.' Mot. to Reconsider, Ex. 1 (Jacobs Dep.) at 202:4 - 205:10.  Inaccurate notice is equivalent to no notice at all, significantly reducing the value and trustworthiness of the TOB Notice regime in general.

---

Defendants have provided.  *Id.*

Moreover, as both the September 24, 2004, Opinion and Order and this Opinion make clear, the Court has not crafted an injunction, and Government Defendants' attempt to re-frame its holding is wrongheaded.  The Court voided the previous systems of Notice due to their clear inadequacies under Due Process law and their noncompliance with the strictures of the DCAPA, and *remanded* rule-making to Defendants in order for Defendants to craft a new system that meets these requirements.  Any reference to "injunctive relief" by Government Defendants and Plaintiffs in this round of filings is contradicted by the Court's carefully-crafted language and remedy.

The remainder of the Court's suggested considerations remain unanswered, even by inference, in the TOB Notice.  As such, under the current TOB Notice regime, which only extends from the October-December 2002 period to present, stakeholders and claimants are still not provided notice or written, published explanations of the standards employed in a reconsideration decision (i.e., what deference, if any, is given to the initial termination decision's legal or factual findings), the weight afforded to various types of evidence, the right to retain counsel, the time frame in which reconsideration decisions will be made, the evidence that the Program will or will not consider, or the potential for extensions of time where a beneficiary has good cause for failing to meet the deadlines imposed by the TOB Notice.  Moreover, under the current TOB Notice regime, stakeholders and claimants are still not provided with any procedural information regarding the initial termination decision.

Third, Government Defendants' approach, and their reliance on the TOB Notice system as the keystone of their defense, crumbles when considered in light of the values underpinning the Due Process guarantee provided by the Fifth and Fourteenth Amendments.  Due Process depends on the essential guarantees of sufficient notice, consistent standards of review, fair procedures, and accountable government.  Under Government Defendants' argument, it is clear that they expect that the system's stakeholders are to deduce the Program's standards and procedures from the piecemeal information given to them in a TOB Notice after the termination decision has been made.  Importantly, the TOB Notice is not published, and beneficiaries have no way of accessing the notice prior to the termination decision.  As discussed previously, even if the TOB Notice was officially issued and made publicly available, it contains no information regarding the procedures surrounding the termination decision and minimal content regarding the

procedures and substantive determinations employed in a reconsideration review.

This *ex post facto* approach based on inference and guesswork arising out of these substantive and procedural inadequacies muddies the framework for the administration of Plaintiffs' benefits.  Due Process is predicated upon clarity and transparency, and Defendants' over-reliance on the TOB Notice system -- in lieu of the creation of a comprehensive, published set of guidelines available to claimants in advance -- ensures that the notice finally given to stakeholders once their benefits are terminated, suspended, or modified is insufficient, half-formed, unclear, and procedurally deficient.

Fourth, the other writings that Government Defendants attempt to use to cover the gaps in the TOB Notice system are equally insufficient.  The RFP issued to bidders for the TPA contract is available only upon a request under the Freedom of Information Act, making it, as Government Defendants understate, "less accessible to claimants than TOB notices."  Gov't Defs.' Mem. at 6 n.7.  Moreover, Government Defendants expressly concede that "the information in the RFP has little if any value to a claimant when he or she is deciding about appealing or seeking reconsideration of a decision to terminate, modify, or suspend his or her benefits."  *Id.*  The Disability Compensation Act and the few regulations implementing it offer no relevant guidance on the procedures for termination, suspension, or modification.  *Lightfoot*, 339 F. Supp. 2d at 81-82.

Finally, three problems exist with Government Defendants' concluding argument that "all citizens are presumptively charged with the law," and therefore, under the "treating physician rule" outlined in caselaw, claimants could be charged with knowledge relating to the weight afforded to certain types of evidence in the initial termination decision.  First, the cases relied

upon by Government Defendants, *Atkins v. Parker*, 472 U.S. 115, 130 (1985), *Federal Crop Insurance Corporation v. Merrill*, 332 U.S. 380, 384 (1947), and *Sandel v. Office of Personnel Management*, 28 F.3d 1184, 1188 (Fed. Cir. 1994), deal with presumptive knowledge of a published statutory enactment by the legislature -- exactly the type of explicit, accessible notice that is required of Defendants under Due Process and the DCAPA, but precisely what Defendants have failed to do in this instance.  Second, the "treating physician rule" identified by Government Defendants only addresses one narrow aspect of the Program's practices, and it does not govern the reconsideration decision.  Third, it is far from clear that the existence of this caselaw -- found largely in electronic legal research databases and not practically accessible to injured workers -- is even known by the Program's administrators or considered binding by them.  Indeed, this Court recognized that the Program was often giving undue weight to the opinions of independent medical examiners in its October 29, 2001, Opinion and Order regarding Plaintiff's Motion for a Preliminary Injunction, *Lightfoot*, Civ. No. 01-1484, at 18 (D.D.C. Oct. 29, 2001) (memorandum opinion and order denying Plaintiff's motion for preliminary injunction despite finding likelihood of success on merits).  Despite *this* caselaw, many of the termination decisions attached to Government Defendants' Motion to Reconsider reveal that Defendants reliance solely on the judgments of independent medical examiners has not, even at this late date, changed.  This inadequacy simply highlights the need for codification of transparent binding regulations that govern initial termination decisions, reconsideration decisions, and decisions on appeal.  Government Defendants' defense of the Program's existing writings simply underscores the lack of clarity and general inadequacy of these documents and supports the Court's September 24, 2004, Opinion and Order.  Government Defendants' Motion to Reconsider is meritless on this

count; rather, the undisputed evidence indicates that the Program's current procedures and framework for initial termination decisions, reconsideration decisions, and decisions on appeal are not in writing and do not provide sufficient notice to claimants.

> B.    *The Court's Legal Findings Relating to Notice and Due Process Do Not Exceed Constitutional Requirements.*

Government Defendants further contend that the Court should reconsider its decision on Count VI of the Third Amended Complaint (Plaintiffs' Due Process claim) because "Due Process does not require that discretionary decision-making to be [sic] delineated in writing."  Gov't Defs.' Mem. at 8.  Government Defendants make two central arguments supporting their contention.  First, Government Defendants posit that "[i]t is impracticable, if not impossible, for the program to reduce the discretionary aspects of eligibility decision-making to writing."  *Id.* at 9.  Second, they assert that "Due Process does not require the Program to reduce to writing a process involving the use of professional judgment and expertise."  *Id.* at 13.  The Court shall deal with each claim in turn.

### 1.    The Impracticality of Reducing Discretionary Aspects to Writing

As discussed previously, *supra* Section III(A), the Court's September 24, 2004, Opinion and Order listed eleven specific areas of concern in the existing Program -- relating to the termination, suspension, or modification of disability compensation benefits -- that Defendants should consider rectifying by adopting explicit written guidelines relating to those areas of concern.  *Lightfoot*, 339 F. Supp. 2d at 92.  The Court noted that by effectuating these rather small changes and making the "'implicit' explicit," the Program might well satisfy Due Process concerns by providing sufficient notice to the system's stakeholders in such a manner that they

22

had a true understanding of the workings of the Program and any changes impacting their disability benefits, which are claimant's sole stream of income. *Id.* At this stage of the present litigation, the Court made it clear that it was not concerned "whether the government's adjusters consistently and properly exercise professional expertise, or whether the District's 'unwritten rules' conform to those commonly used in the industry." *Id.* at 90. Ultimately, the Court was focused on ensuring that Plaintiffs received adequate information and that set standards existed to ensure accountability and consistency in adjudication

In their Motion to Reconsider, Government Defendants do not quarrel with ten of the Court's identified areas of concern that pinpointed where information was not provided at all or was provided to a minimal degree. Instead, Government Defendants focus on only one category noted by the Court -- "What standards are employed in making the termination decision, and what weight is afforded each piece of information before the adjuster?" -- and argue that this kind of "eligibility decision involves weighing evidence and balancing competing sources of *specialized* information, a process that is at least as complex as judicial fact-finding." Gov't Defs.' Mem. at 12 (emphasis in original). Government Defendants submit that "it is almost impossible to fairly prescribe in writing the 'weight' that ought to be attached to any particular piece of evidence in this process." *Id.* According to Government Defendants, the allegedly "unrefuted, expert opinion[s]" offered by Ms. Dailey and Mr. Jacobs support this conclusion that what the Court "requires" is impracticable at best, impossible at worst, and beyond the requirements of the Constitution at the very least. *Id.* at 13.

The Court notes the irony of Government Defendants' "impracticality" and "impossibility" arguments in light of their representations to the Court in a Praecipe Clarifying

the Government Defendants' Position Regarding Plaintiffs' Pending Partial Motion for Summary Judgment Following the Court's Order of August 18, 2004 ("Gov't Defs.' Praecipe").  In their Praecipe, filed August 25, 2005, Government Defendants represented that

> the Disability Compensation Program will shortly be issuing new policies and procedures that are far more comprehensive than the "Guidelines" originally contemplated prior to the many months of settlement negotiations that have occurred between the parties.  The policies and procedures are expected to greatly enhance, clarify, and/or put in writing certain pre-existing Program policies, procedures, and/or practices.

Gov't Defs.' Praecipe at 1.  Given this representation, Government Defendants' assertion that they cannot go beyond the existing system in addressing concerns such as the eleven considerations identified by the Court appears groundless.

The Court certainly understands Government Defendants' concern that they cannot accomplish the "impossible," but finds that Government Defendants effectively misunderstand and misconstrue the Court's prior holding.  It is obvious why Government Defendants failed to challenge ten of the Court's identified areas of concern in their existing Program:  these items all addressed procedural aspects of the Program that are readily articulable and impose minimal, if any, limits on adjusters' "professional judgment."  As to the standards employed and weight given to evidence in the termination decision, the Court concludes that Government Defendants have misread the Court's September 24, 2004, Opinion and Order to suggest that every aspect of the termination-decision procedure be captured in writing.  Taking Government Defendants' example as a starting point, while judicial fact-finding does require weighing evidence and balancing complex, often competing specialized information, it still occurs within certain preset, articulated, readily-accessible parameters.  Likewise, certain aspects of the termination procedure

24

can easily be captured in writing and should be articulated; these aspects include, but are not

necessarily limited to, the burden of proof, the standard governing such decisions (e.g., *de novo*

review, review for clear error, or some other formulation), the level of deference given to prior

factual or legal determinations, the necessity of addressing each argument raised on

reconsideration, when and how independent medical examinations are used, and the weight to be

afforded specific *types* of evidence -- such as documents created and submitted after the

termination decision, a claimant's subjective account of his or her condition, and the treating

physicians' opinions.

Government Defendants justify their failure to articulate and announce these aspects of

the Program in writing on the ground that it would constrain professional judgment.  Gov't

Defs.' Mem. at 13.  Such an excuse is unavailing and without support.  Former Director of the

Office of Risk Management, James Jacobs, acknowledged that documentation of "best practices"

generally does exist -- though documentation of the version of "best practices" that governs the

Program does not exist.  Pls.' Opp'n to Gov't Defs.' Mot. to Reconsider ("Pls.' Opp'n"), Ex. 1

(Jacobs Dep.) at 235:5 - 236:10.  Moreover, Government Defendants' contention that rules

governing these issues identified above by the Court cannot be put in a "meaningful writing,"

Gov't Defs.' Mem. at 21, is refuted by the practices of the Social Security Administration.[5]  The

---

[5] Even Plaintiffs admit that "[t]he general level of detail in the SSA's [Social Security Administration's] guidelines exceeds anything Plaintiffs seek, and those guidelines address dozens of issues not raised in the Court's checklist."  Pls.' Opp'n at 11 (citing examples). Government Defendants, in their Motion to Reconsider, argue that the regulations promulgated under the allegedly comparable Federal Employee Compensation Act ("FECA") are largely "silent" "on the question of *how* claims adjusters should *exercise their judgment* when reducing or terminating a claim."  Gov't Defs.' Mem. at 10.  This argument was never raised in Government Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment, and a Motion to Reconsider is not the place to raise new arguments that certainly should have been

Social Security Administration has, for many years, detailed regulations that relate directly to the

substance of disability determinations, including rules relating to:  the definition of "disability,"

20 C.R.F. § 401.1505-1511; categories of relevant evidence and who may provide it, *id.* §

404.1512-1513; when a consultative examination is required and the content of such reports, *id.*

§ 404.1519, *et seq.*; how examiners evaluate disabilities, *id.* § 404.1520; how examiners evaluate

opinion evidence, including the treating physician's preference, *id.* § 404.1527; and how

examiners evaluate symptoms, including pain, *id.* § 404.1529.  These detailed Social Security

Administration regulations narrow and guide the application of discretionary judgment and

inform the stakeholder who wishes to advance relevant facts and argument to support an

entitlement for disability benefits.  They do not, however, purport to supplant the exercise of

judgment.

As such, contrary to Government Defendants' view, the Court's requirement of greater

notice is hardly unprecedented, impracticable, or impossible to achieve; indeed, the Court's

September 24, 2004, Opinion and Order still leaves room for Defendants to exercise their

necessary "professional judgment" in the termination, suspension, and modification process, but

ensures that such "judgment" is to take place within a known system and articulated framework.

The Court stresses that Defendants might well satisfy Due Process concerns -- in part -- upon an

articulation and announcement of the identified aspects of the termination procedure that can

---

raised previously.  The Court reiterates that the Court's September 24, 2004, Opinion and Order
merely directed Defendants to certain unanswered questions that would be pertinent to a Due
Process analysis:  FECA's system of notice is not before this Court, and the Court makes no
judgment as to the adequacy of its notice.  The Court instead highlights that the SSA and other
programs have created the kinds of notice that prove that Government Defendants' claim of
"impossibility" is spurious.

easily be captured in writing.  The fundamental Due Process guarantee of "notice" requires no less.

2.      <u>Writing and the Requirements of Due Process</u>

Government Defendants contest as clearly erroneous in two respects the Court's finding that the notice guarantee of Due Process requires written rules governing the disability benefit termination, suspension, or modification process.  First, Government Defendants suggest that "preordained standards" currently exist to govern the Program's eligibility decisions, which act to cabin the risk of arbitrary decision-making.  Second, Government Defendants assert that the development of standards in a piecemeal method via individual adjudication of claims -- rather than sweeping rule-making -- is permissible under Due Process.  The Court shall address each of Government Defendants' claims.

<u>First</u>, Government Defendants' citation to a hodgepodge of allegedly binding "preordained standards" simply highlights the deficiencies within the existing system. Government Defendants once again offer the Declaration of Ms. Dailey for the proposition that unwritten "best practices" should not trouble this Court because "best practices" are "national standards."  Gov't Defs.' Mem. at 12.  The Court previously noted several problems with this contention and Government Defendants offer no new evidence upon reconsideration.  *See, e.g.*, *Lightfoot*, 339 F. Supp. 2d at 82 n.1 (Jacob's admitted in his deposition that "Best practices are by definition a consensus of what the industry perceives to be its best practices and *that would vary depending on who was doing the analysis of the best practices*") (emphasis in original); *id.* at 90 n.8 (the use of "best practices" in private workers' compensation programs is not subject to the kinds of Due Process and rule-making requirements present in the public sector); *id.* at 20

27

(problem with present system of unwritten "best practices" and little else is that they provide insufficient notice and open the door to unaccountable, arbitrary decision-making that claimants have no way of challenging).  The other allegedly "preordained standards" equally fail to provide sufficient notice or cabin possibly inconsistent and arbitrary decision-making.  Once again, while Government Defendants point to "the requirements of the Act, applicable regulations, the Request for Proposal (contract), Program directives, and case law," Gov't Defs.' Mem. at 14, they offer no new evidence explaining how the Court's previous findings in this area were clearly erroneous.  As the Court has recognized. none of these documents -- containing only a patchwork of statements from which inferences may be drawn -- meaningfully constrain the discretion of Program officials on any relevant issue.  Indeed, this patchwork contains more holes than fabric, as the documents cited by Government Defendants leave the most important aspects of the Program entirely unaddressed.

Second, Government Defendants' assertion that they are permitted to develop binding rules through an ad hoc system of individualized adjudication, rather than drafting and promulgating a standardized set system of written rules, is groundless.  Government Defendants offer no evidence that they actually have developed or even *can* develop rules through adjudication.  None of the termination or reconsideration decisions rendered by Defendants has any binding effect beyond that specific case; none of the case-specific Notices provided by Defendants to the Program's claimants even purport to address the Program's overall procedures; and due to both the nature of the review by Department of Employment Services ("DOES") Administrative Law judges and the fact that the bulk of the Program's procedures are not set forth in the D.C. Code or regulations, DOES has no occasion to create such procedures.  Even if

28

binding termination and reconsideration decisions that addressed the specific issues raised by the Court could flow from this type of system, they would still not be publicly available. The Program's beneficiaries would have no way to learn of the adjudicatory decisions that would be binding Program policy.

Moreover, Government Defendants fail to recognize the inherent check created by Due Process on their asserted administrative law principle that agencies may (sometimes) announce standards via adjudication rather than rule-making. The D.C. Court of Appeals has recognized that only when standards announced in an adjudicative proceeding are binding, adequately published, and conveyed to the relevant beneficiary population can they be followed as "rules." In *Washington Hospital Center v. District of Columbia Department of Employment Services*, 743 A.2d 1208, 1211 (D.C. 1999), the D.C. Court of Appeals found that "when a new rule is established through individual adjudication, due process requires that the agency provide notice which is reasonably calculated to inform all those whose legally protected interests may be affected by the new principle." *Id.* The D.C. Court of Appeals has applied this principle to this very Program in *Epstein v. District of Columbia Department of Employment Services*, 850 A.2d 1140 (D.C. 2003), reversing the DOES Director's retroactive application of a new "notice and opportunity to cure" requirement to suspension of vocational rehabilitation benefits on the ground that the party in question could not have been aware of the requirement when the proceeding began. *Id.* at 1143. Echoing what this Court has said all along, the D.C. Court of Appeals found that "Due Process requires fair adjudication, and . . . fair adjudication requires decisionmaking with reference to ascertainable standards of which the parties have adequate notice." *Id.* (citations omitted). Nothing in the record indicates that Government Defendants

have ever notified beneficiaries that any standards articulated in any termination, suspension, or modification decisions or in any caselaw constitute rules governing the Program.

Federal courts have gone even further in limiting the power of agencies to bypass rule-making.  In *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759 (1969), the Supreme Court specifically rejected an attempt by the National Labor Relations Board to "promulgate new rules in adjudicatory proceedings, without complying with the requirements of the Administrative Procedure Act."  *Id.* at 764.  The Court struck down this attempt to exercise "quasi-legislative power" because

> [t]he rule-making provisions of that Act, which the Board would avoid, were designed to assure fairness and mature consideration of rules of general application.  They may not be avoided by the process of making rules in the course of adjudicatory proceedings.  There is no warrant in law for the Board to replace the statutory scheme with a rule-making procedure of its own invention.

*Id.*  Just as Government Defendants failed to publish their current scheme regarding the termination, suspension, or modification of disability compensation benefits in the *D.C. Register* using notice-and-comment rule-making, the Board failed to publish its new rules in the *Federal Register*.  *Id.* at 64-65.  The Court condemned this failure to conform to the "substance of the requirements of the Administrative Procedure Act," finding that "the terms or substance of the rule would have to be stated in the notice of hearing [published in the *Federal Register*], and all interested parties would have an opportunity to participate in the rule making."  *Id.*

Other federal courts have followed the Supreme Court's lead and rejected the end-run around Due Process attempted by Government Defendants.  *See, e.g., Alabama Power Co. v. FERC*, 160 F.3d 7, 11 n.5 (D.C. Cir. 1998) ("The APA does not contemplate the use of adjudication to develop rules."); *Hatch v. FERC*, 654 F.2d 825, 835 (D.C. Cir. 1981) (where an

agency seeks to apply a new standard of law in adjudication, the party before the agency must have prior notice of the standard); *Patel v. INS*, 638 F.2d 1199, 1204-05 (9th Cir. 1980) (holding that where a policy "may be stated and applied as a general rule" rather than by case-by-case determinations, it should be announced via rule-making, and that policymaking via adjudication should be struck down when it represents "a circumvention of rulemaking procedures"); *see also Nat'l Wildlife Fed'n v. Clark*, 577 F. Supp. 825, 828 (D.D.C. 1984) (rebuking agency's attempt to avoid accountability by claiming that it could make ad hoc adjudicative decisions rather than conduct a rule-making because it would avoid the possibility of judicial review as well as notice and comment). Government Defendants' current scheme is even more blatantly improper than these condemned attempts, as they seek to insulate themselves from charges of arbitrariness by failing to announce standards altogether. Such an evasion of notice and accountability is not consonant with the strictures of Due Process.

In sum, Government Defendants have not, in any meaningful sense, articulated the standards and parameters governing the termination, suspension, or modification of its disability compensation benefit scheme either through rule-making, case-by-case adjudication, or the hodgepodge of rather inaccessible writings surrounding the Program. This failure violates both administrative law and Due Process, and should be rectified through notice-and-comment rule-making that sets forth transparent, available, consistent standards. Government Defendants' allegation that the Court's September 24, 2004, Opinion and Order is "clearly erroneous" on this point is without merit.

C.       *The Program's Procedures Are Clearly "Rules" Within the Meaning of the DCAPA and Must be Promulgated Through Notice-and-Comment Rule-Making.*

Government Defendants offer only token opposition to the Court's ruling on Count VII of the Third Amended Complaint that the Government Defendants' reliance on rules not promulgated under the DCAPA.  The Court's initial factual and legal findings in this area were quite detailed and extensive.  *Lightfoot*, 339 F. Supp. 2d at 92-96.  Citing a veritable deluge of statutory subsections and cases, the Court found that policies regarding eligibility for benefit programs are considered "rules" under the DCAPA.  *Id.* at 93. All evidence clearly indicated that the "policy determination process -- which Defendants are clearly undertaking when setting out unwritten procedures which affect Plaintiffs' property interests -- is clearly substantive rule-making." *Id.* at 94.  As such, under the broad definition of "rule" provided by the DCAPA, "publication for notice and comment purposes is required by the DCAPA -- a step Defendants[] have admittedly failed to take." *Id.* at 94.  Indeed, the Court noted that other District of Columbia agencies have published regulations governing termination procedures, rendering Government Defendants' cries of "impossibility" void. *Id.* at 93-94.

In their Motion to Reconsider, Government Defendants offer no analysis of the Court's detailed statutory and caselaw reasoning.  *See* Gov't Defs.' Mem. at 21-23.  Rather, in contravention of the rule that a motion for reconsideration "is not a second opportunity to present argument upon which the Court has already ruled, nor is it a means to bring before the Court theories or arguments that could have been advanced earlier," *W.C. & A.N. Miller Cos.*, 173 F.R.D. at 3, Government Defendants' argument -- to a large extent -- consists of a giant section of their previous Opposition to Plaintiff's Motion for Partial Summary Judgment that has simply

been cut-and-pasted onto their current motion.  Government Defendants also reverse themselves in their argumentation:  while they once had asserted that "guidelines governing termination, suspension or modification of benefits are 'internal' and therefore not 'rules' subject to the DCAPA's notice requirements," *Lightfoot*, 339 F. Supp. 2d at 94, Government Defendants now admit that they are "rules of general application" but assert that "the Program is not required to promulate *any* of its procedures as rules and is permitted to merely announce them in its decisions as Program policy, so long as it provides proper notice to claimants."  Gov't Defs.' Mem. at 23.  Once again, Government Defendants' assertion is belied by the fact that its current practices are not set forth *anywhere* -- neither in rules nor binding, publicly-available adjudicative decisions.  Moreover, Government Defendants' bold claim runs afoul of the broad requirements of the DCAPA, which define "rule" in a broad manner and clearly require notice-and-comment rule-making in schemes such as those currently confronting Plaintiffs.

Perhaps realizing these problems, Government Defendants represented to the Court in their Praecipe that the promised, forthcoming policies and procedures -- which were to "greatly enhance, clarify, and/or put in writing certain pre-existing Program policies, procedures, and or/practices" -- were to "be incorporated into the District Personnel Manual and published in the D.C. Register."  Gov't Defs.' Praecipe at 1-2.[6]  Given Government Defendants' attempt to re-litigate the Court's ruling as to Count VII of Plaintiffs' Third Amended Complaint with no new evidence, arguments raised previously and rejected in this Opinion, and an attempted resurrection of their moribund Opposition, the Court finds Government Defendants' contention that the

---

[6] The Court notes that while Government Defendants were willing to write and publish the rules, they continued to refuse to issue the new rules in accordance with the notice-and-comment provisions of the DCAPA.  Pls.' Response to Gov't Defs.' Praecipe.

Court's findings "are erroneous and should be reconsidered" without merit.  Rather, the essential

thrust of the Court's ruling on this issue in its September 24, 2004, Opinion and Order stands

uncontroverted.

      D.    *The Remedy Ordered By the Court Is Proper.*

As noted previously, the Court's September 24, 2004, Opinion and Order concluded with

a specific section detailing the proper remedy to rectify Defendants' unconstitutional,

unpublished system of inadequate notice and procedure regarding disability benefit termination,

suspension, and modification.  *Lightfoot*, 339 F.Supp. 2d at 96.  The Court, in finding that

Defendants' current system was void due to these infirmities, crafted a remedy awarding

prospective relief to Plaintiffs.  The Court ordered "that the disability compensation benefits,

both cash and medical, of all members of the Plaintiff class be reinstated as of the date of this

Opinion and Order, until individualized termination, modification, or suspension determinations

may be made under validly promulgated rules."  *Id.*  Government Defendants now object to this

remedy, which they suggest entails "reinstating *all* persons who have been in the Program at any

time during the period covered by the class, who have been the subject of eligibility decisions,

without regard to the *effect* of those decisions."  Gov't Defs.' Mem. at 24 (emphasis in original).

According to Government Defendants, "this directive, which does not allow defendants to first

conduct individualized determinations as to each class member's *current* entitlement to benefits,

if any, is both impossible and contrary to the law, and therefore should be reconsidered."  *Id.*

(emphasis in original).

      1.    <u>Preliminary Considerations</u>

Before delving into the argument concerning the Court's remedy, the Court notes three

preliminary facts.  First, as discussed by the Court in its September 24, 2004, Opinion and Order,

the issue of the proper remedy "was well-briefed by Plaintiffs."  *Lightfoot*, 339 F. Supp. 2d at 96

n.13 (citing examples).  However, "[i]n its briefing, the Government chose not to respond to this

issue" at all, effectively conceding the argument.  *Id.*  As the Court explained in Section II, Rule

59(e) motions for reconsideration are not to be granted by the District Court "in order to consider

a new defensive theory which could have been raised during the original proceedings."  *Kattan*,

995 F.2d at 276 (citing cases).  Despite Government Defendants wholesale failure to brief this

point previously and their inability to explain this failing, the Court, in the interests of justice,

shall consider their newly-raised arguments in the context of this motion to ensure that accuracy

and fundamental fairness prevails -- two values that the Court holds dear but that Defendants'

current termination, suspension, and modification system eschews.

Second, and most importantly, Government Defendants, in their August 25, 2005,

Praecipe, represented to the Court that its promised new, expansive written rules governing the

termination, suspension, and modification of benefits would be issued "shortly" and ready for

publication.  Gov't Defs.' Praecipe at 1-2.  However, due -- in part -- to the voluntariness of

Government Defendants' proposed action, which ensured that changes in the future could occur

unchecked by existing law and could have allowed the six impeded years of unlawful

terminations, suspensions, and reductions of disability benefits to continue unabated in the future

without a definite end-date to force the Government's compliance with its promises, the Court

chose to reject Government Defendants' request and issued its September 24, 2004, Opinion and

Order.  As of that point, what Government Defendants had indicated they would voluntarily do

was now legally required under this Court's Order.  True, the Court's September 24, 2004,

Opinion and Order required Government Defendants to go slightly further than they had

represented, in terms of more specific aspects regarding notice and the requirement of notice-

and-comment rule-making as per the DCAPA, but Government Defendants were on notice of

many of the deficiencies with the existing system, had a partial solution ready to go, and were

then advised how to more fully correct the present failings by the Court's very specific Opinion

and Order.  To the extent that Government Defendants now claim that exorbitant monies are now

owed -- and continue to accrue -- to Plaintiffs because of the Court's reinstatement pending

individualized determinations under adequate and validly promulgated rules, their claim falls

victim to Mason Cooley's aphorism "Court disaster long enough, and it will accept your

proposal."  MASON COOLEY, CITY APHORISMS, THIRD SELECTION (New York 1986).

Government Defendants' failure to follow its promises and the Court's explicit September 24,

2004, Opinion and Order has kept thousands of disabled workers whose sole income is often

their disability compensation benefits from receiving their just individualized determinations

within a procedural scheme in accordance with Due Process and local law.  Indeed, Government

Defendants' failure to take action simply highlights the wisdom of the Court's September 24,

2004, Opinion and Order and the need to ensure legal accountability for the contours of the

Program.  Government Defendants' failure to mitigate their damages does not excuse their

continued violations.[7]

---

[7] The Court notes that the only concrete information that parties in this case have
provided the Court regarding Government Defendants' compliance or non-compliance with the
Court's September 24, 2004, Opinion and Order, is in Plaintiffs' Amended Status Report of
January 27, 2005.  Plaintiffs indicate substantial non-compliance on the part of Defendants with
the Court's ruling, despite the parameters of the Court's holding and Government Defendants'
representations of major progress planned in the near-future in their August 25, 2004, Praecipe.
*See* Pls.' Status Report at 1 ("To date, despite this Court's and Magistrate Judge Facciola's

<u>Third</u>, Government Defendants complaint that they cannot reinstate benefits because they do not have contact information for all class members is groundless. *See* Gov't Defs.' Mem. at 24-25; Gov't Defs.' Mot. for Stay at 1-2. Once again, the Government has only itself to blame for haphazard, inadequate record-keeping, and its internal administrative "infirmities" should not allow it to continue to avoid what is due to its current and former employees with actual physical infirmities resulting from their service to the Government. The solution is to immediately reinstate benefits pending proper and validly issued rules and legitimate individualized determinations for those class members who can be readily identified. As the Office of Risk Management has represented, the Government possess a complete list of all claimants as of the year 2000. Gov't Defs.' Mot. for Stay, Ex. 1 (Decl. of Pamela Brown, ORM Claims Supervisor) at ¶ 19 ("I believe that ORM has a complete list of all claimants as of 2000, but as I have noted, neither ORM nor the TPA has complete records going back to 1998). Outside of this, Government Defendants are required to conduct a reasonable review of all available documentation and to make their best efforts to identify as many members of the class as possible. In order to gauge this effort, the Court refers the oversight of this matter to Magistrate Judge Facciola, who is already discussing retroactive relief with the parties -- identification and notification of claimants being as vital and relevant to retroactive relief as to the prospective reinstatement.

---

efforts, the Government Defendants have not reinstated the benefits of any member of the Plaintiff class and have not promulgated governing rules. Plaintiffs understand, however, that the Government Defendants have, since September 24, 2004, stopped terminating, suspending or reducing benefits."). As such, the Court cannot predict with any certainty the cost of the Government's failure to mitigate.

37

2.      Government Defendants' New Argument Regarding the Ordered Remedy

Government Defendants new argument regarding the proper remedy is that reinstatement should follow, rather than precede, individualized termination, suspension, or modification process under the newly promulgated rules ordered by the Court, because -- according to Government Defendants -- the only remedy available to a due process violation is nominal damages.  Gov't Defs.' Mem. at 22 (citing *Carey v. Piphus*, 435 U.S. 247, 260 (1978)). Government Defendants' argument is flawed in two respects:  (1) it is incorrect as a matter of Due Process law; and (2) it ignores the appropriate relief for violation of the APA.  The Court, in its September 24, 2004, Opinion and Order found that prior benefit terminations, suspensions, and reductions were void; its restoration of the status quo was entirely proper.

Importantly, the Court's reinstatement order is prospective in nature; it does not restore any benefits that should have been paid prior to September 24, 2004, and directs only that the Government Defendants begin paying benefits to class members prospectively until the identified legal and constitutional infirmities surrounding the Program are cured.[8]  Given these parameters, Government Defendants' argument misconstrues *Carey* and its progeny as it relates to the Court's September 24, 2004, Opinion and Order.

---

[8] Plaintiffs claim in their filings that the Court's Order was tantamount to an action that "impliedly enjoined" the Government Defendants from terminating, suspending, or reducing benefits until written rules are developed and published. Pls.' Opp'n to Gov't Defs.' Mot. to Stay at 1 n.2.  Plaintiffs noted that they "understand Government Defendants are complying with this part of the Order."  *Id.*  The Court takes care to highlight that it declared Defendants' procedures "void" but did not issue an injunction -- instead, it crafted a "remand" with specific guidelines but did not get into a merits-based determination.  *Lightfoot*, 339 F. Supp. 2d at 96. As such, Defendants cannot rely on the previous regime largely unwritten rules that the Court found fault with in its September 24, 2004, Opinion and Order to make new termination, suspension, or reduction decisions.  The Court did *not* issue an injunction and did not analyze the case under the legal standards for an injunction.

Indeed, Government Defendants' substantial reliance on *Carey* is misplaced in this instance. At issue in *Carey* were compensatory damages awarded to students who had been suspended from school without procedural due process. As the district court in *Carey* observed, the record was barren of any evidence upon which even a speculative measurement of damages could be based. *Carey*, 435 U.S. 251-52. On appeal, the Supreme Court held that in the absence of any such evidence, actual damages could not be presumed. *Id.* at 262-65. Essentially, the *Carey* Court concluded that a court, without any evidence, could not presumptively award compensatory damages for the violation of Due Process rights when the underlying substantive determination is correct -- only nominal damages of $1.00 were appropriate. *Id.*; *see also Zinermon v. Burch*, 494 U.S. 113, 126 n. 11 (1990) (*Carey* established "that in cases where the deprivation would have occurred anyway, and the lack of due process did not itself cause any injury (such as emotional distress), the plaintiff may recover only nominal damages.").

The remedy ordered in the Court's September 24, 2004, Opinion and Order is certainly distinguishable from the situation encountered in *Carey v. Piphus*. First, the Court's remedy is equitable and prospective -- it is not a compensatory damages remedy. The remedy undoes the Government Defendants' illegal acts and requires reinstatement of benefits as of the date of the Order, but makes no finding or presumption regarding entitlement to benefits before that time. Rather, the Court specifically reserved ruling as to "the issue of possible retroactive relief for Plaintiffs to recover monies for the period stretching from the date of the termination, modification or suspension of their benefits to the date of this Opinion and Order." *Lightfoot*, 339 F. Supp. 2d at 96. Instead, the Court referred the parties to Magistrate Judge Facciola for the possible resolution of all retrospective relief and, if appropriate, compensatory damages. Unlike

the kind of compensatory damages award based on a Due Process violation dealt with in *Carey*,

the Court's remedy did not determine a set dollar amount owed by Defendants that was

connected to a Due Process violation.  What the Court's remedy did instead was to void the

unconstitutional system and place Plaintiffs in the same position had the constitutional violation

not occurred.  Moreover, unlike the kind of set, permanent award prohibited by *Carey* and its

progeny, Defendants -- not the Court -- ultimately determine the amount of money that must be

paid to Plaintiffs through the speed and quality of their compliance with the Court's Opinion.

<u>Second</u>, and perhaps even more importantly, to the extent that the Court's remedy could

possibly be construed as "retrospective" (in the sense that eligible Plaintiffs now should receive a

flow of monies equivalent to their previous benefit stream until the Government follows legal

and constitutional requirements), such a remedy is in accordance with well-established precedent.

To make it clear:  Government Defendants' worry is that the Court is awarding "back pay" to the

entire class and, because it is likely that at least some of the Defendants' ultimate termination,

suspension, or reduction decisions would have occurred even if proper procedural Due Process

rights had been observed, the Court's award of "back pay" to this subset of Plaintiffs contravenes

*Carey v. Piphus*.  Gov't Defs.' Mem. at 25; Gov't Defs.' Reply at 10.  Such an argument is

inapposite given the actual parameters of the Court's ruling, and it is noteworthy that the Court is

merely following the precedent of at least two other Circuits.  Judge Richard Posner, in the

Seventh Circuit's ruling in *Patterson v. Portch*, 853 F.2d 1399 (7th Cir. 1988), recognized that

even a plaintiff in the position of the subset identified by Government Defendants -- i.e., who has

suffered a Due Process violation but who would lose or have his or her benefits reduced anyway

-- was due the kind of award provided by the Court in its remedy.  As Judge Posner explained,

> All [plaintiff professor] lost *as a result of the constitutional violation* was his salary between the day that [the chancellor] terminated him and the day on which his dismissal would have taken effect had [the chancellor] followed the prescribed procedures.  That loss . . . plus the monetary equivalent of any "mental and emotional distress . . . actually caused by the denial of due process itself," *Carey v. Piphus, supra*, 435 U.S. at 263 . . . minus so much of the loss as might have been averted by reasonable efforts to mitigate damages, constitutes the damages that [plaintiff] would be allowed to recover from [the chancellor].

*Id.* at 1408 (emphasis in original); *see also City of Chicago v. United States Dep't of Labor*, 737 F.2d 1466, 1472 (7th Cir. 1984) (same).  The Eighth Circuit in *Brewer v. Chauvin*, 938 F.2d 860 (8th Cir. 1991), agreed with this analysis, finding that "[i]t therefore follows logically that an employee who has a due process right to a pre-termination hearing and who is discharged without being given one would be entitled to back pay from the date of his discharge to the earliest date the discharge could have taken effect had the proper procedures been followed." *Id.* at 864; *see also id.* at 865 ("If the District Court finds that [plaintiff] would have been fired even if procedural due process had been observed, then he is not entitled to an award of back pay except for a limited award based on the earliest date he could have been fired if *Loudermill* procedures had been followed."); *see, e.g.*, *Leonardi v. Bd. of Fire Comm'rs of Mastic Beach Fire Dist.*, 643 F. Supp. 610, 614 (E.D.N.Y. 1986) (same); *Youakim v. McDonald*, Civ. No. 73-635, 1996 WL 392150, at *4-*5 (N.D. Ill. July 11, 1996) (same); *accord* 2 Emp. Discrim. Coord. Analysis of Federal Law § 62.42 ("Backpay award . . . is calculated from the date of the discharge to the earliest date the discharge could have taken effect if proper procedures had been followed."); Martin A. Schwartz, *Damages For Constitutional Violations*, 9/17/91 N.Y.L.J. 3 (col. 1) (reviewing caselaw and concluding an employee who cannot show an unjustifiable deprivation may still recover for the period between the date of discharge under improper

procedures to the earliest date the discharge could take effect under proper procedures) (citing

*Brewer*, 938 F.2d at 865).  The Court's remedy in its September 24, 2004, Opinion and Order is

virtually identical to the kind of award allowed under these precedents:  the Court found that

Government Defendants' previous procedures were improper under both local law and the

Constitution and, in a sense, reinstated Plaintiffs' benefit stream from the date that the

terminations, suspensions, and reductions were identified as deficient until the earliest date the

discharges could have taken effect had the proper procedures been followed -- i.e., whenever

Government Defendants could reform their policies, properly issue the Program's rules as

outlined in the Court's September 24, 2004, Opinion and Order, and conduct adequate

individualized determinations.  As such, the Court's remedy is in accordance with established

precedent and carefully toes the line drawn by *Carey*.

Moreover, such reinstatement remedies are commonplace under the DCAPA, as the

Court found.  *Lightfoot*, 339 F. Supp. 2d at 96; *see, e.g.*, *Webb v. Dist. of Columbia Dep't of*

*Human Serv.*, 618 A.2d 148, 152 (D.C. 1992) ("We conclude that reinstatement of benefits

pending a determination that continued eligibility under properly promulgated regulations is

warranted."); *Aikens v. Dist. of Columbia Dep't of Hous. and Cmty. Dev.*, 515 A.2d 712, 719

(D.C. 1986) (upon Due Process violation, the D.C. Court of Appeals chose to "remand this case

to DHCD with instructions to reinstate petitioner's Section 8 benefits, and to develop procedures

specifying time allowed Section 8 participants to supply income verification documents during

recertification").  Courts have also routinely ordered similar reinstatements of benefits as a

prospective remedy for Due Process violations.  *See, e.g.*, *Matlovich v. Sec'y of the Air Force*,

1980 U.S. Dist. LEXIS 14201, *1 (D.D.C. Sept. 10, 1980) ("Ordered that plaintiff shall be

promptly reinstated in the Air Force at the rank and salary which he would have in normal course obtained had he not been unlawfully discharged . . . ."); *Kennedy v. Bowen*, 814 F.2d 1523, 1525 (11th Cir. 1987) (finding that because "observance of the notice provision is dictated by due process and fundamental fairness" and because plaintiff "was denied such notice," it was necessary to order plaintiff's "disability benefits be reinstated as of the date of their termination"); *Cooley v. Bd. of Educ. of Forrest City Sch. Dist.*, 453 F.2d 282, 287 (8th Cir. 1972) (ordering plaintiff's "reinstatement to his former position" and noting that "[t]he period for which damages may be shown is the period between the date of his discharge and the effective date of his reinstatement"); *Hiraldo-Cancel v. Aponte*, 925 F.2d 10, 14 (1st Cir. 1991) (affirming district court's order that employees discharged in violation of the Constitution be reinstated); *Lefford v. McCall*, 916 F. Supp. 150, 157 (N.D.N.Y. 1996) (ordering reinstatement of pension benefits until adequate hearing and proper due process was afforded); *Irizarry v. Cleveland Pub. Library*, 727 F. Supp. 357, 365 (N.D. Ohio 1989) ("the proper remedy is to place the defendant in the position that the Constitution mandates he be in prior to a pretermination hearing -- awaiting said hearing while receiving pay"); *DelSignore v. DiCenzo*, 767 F. Supp. 423, 428-29 (D.R.I. 1991) (same).

Government Defendants, in an attempt to avoid this wealth of precedent, simply assert -- without authority -- that reinstatement is not a proper remedy in cases dealing with more than one claimant or in class actions. Despite Government Defendants' vain protestations, courts routinely have ordered reinstatement as a remedy for procedural due process in cases involving multiple plaintiffs or class actions. *See, e.g.*, *Willis v. Lascaris*, 499 F. Supp. 749, 760 (N.D.N.Y. 1980) (restoring food stamp allotments to approximately 6000 households and enjoining

reduction of food stamp allotments until defendants craft acceptable notice that meets the strictures of Due Process); *Banks v. Trainor*, 525 F.2d 837, 841 (7th Cir. 1975) (approving reinstatement of the food stamp benefits to members of a wide class of food stamp recipients spanning the state of Illinois when their food stamps were reduced without proper Due Process); *Tracy v. Salamack*, 572 F.2d 393, 396 (2d Cir. 1978) (modifying preliminary injunction but affirming reinstatement of a class of 77 prisoners into temporary release program); *Febus v. Gallant*, 866 F. Supp. 45, 47 (D. Mass. 1994) (ordering reinstatement of welfare benefits to class of "at least 604 individuals" where termination notice was confusing, inaccurate, and insufficient under Due Process analysis but -- like this Court -- refraining from dealing with retrospective lost benefits).

Given the wealth of precedent and the parameters of the Court's remand, the Court's reinstatement of Plaintiffs' disability benefits from the date of the Court's September 24, 2004, determination that Defendants' existing notice and procedures were unlawful under the Constitution and under local law until the date that Plaintiffs are afforded adequate individualized determinations under a scheme consonant with Due Process and local law is proper. Government Defendants' recalcitrance to follow the Court's order and their own representations, and their past failure to maintain adequate records, is no excuse for allowing Plaintiffs to go without their due benefits until those benefits are properly terminated, suspended, or reduced within an adequate system. Based on the Court's order suggesting certain changes that will allow the Program to meet the guarantees of the Constitution and directing Defendants down the proper avenue of publication, notice-and-comment rule-making, and valid issuance, it is in the hands of Government Defendants to rectify the Program's existing infirmities and

mitigate any damages.

       E.      *Clarification of the Court's September 24, 2004, Opinion and Order*

In addition to their Motion to Reconsider, Government Defendants' filings also ask that the Court "clarify the scope of class members who must be immediately reinstated to the Program." Gov't Defs.' Mem. at 30.  Plaintiffs also admit that a clarification might be necessary so that the remedy is not overly broad, noting that "minor modifications to the Court's reinstatement order are appropriate." Pls.' Opp'n to Govt' Defs.' Mem. at 27.  In order to clarify its holding and speed any progress in the resolution of this case, the Court will briefly list and describe to whom its September 24, 2004, Opinion and Order does *not* apply in order to cure any of Government Defendants' fears of overbreadth.  *See id.* at 28-29.  Clearly the Court's remedy should not be read to allow collection by those who would be precluded by statute or law.  As such, the Court's prospective relief ordered should *not* be read to cover:  (1) deceased class members who, while they may still be entitled to retroactive compensatory damages, are not eligible for continuing benefits under D.C. Code § 1-623.02, *see* Pls.' Mem. in Opp'n to Gov't Defs.' Mot. to Reconsider at 26 (Plaintiffs consent to this exclusion); (2) individuals who have been *upwardly* modified,[9] and therefore lack standing under *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) -- meaning that the Court's references to "modification" apply in practice to "reduction"; and (3) current employees who have returned to work, and therefore are not likely to

---

[9] The Court notes that claimants whose benefits were only "upwardly modified" during the relevant time period were not in the class of Plaintiffs under this Court's Memorandum Opinion and Order of January 14, 2004, granting class certification. *Lightfoot*, Civ. No. 01-1484, at 4 (D.D.C. Jan. 14, 2004) (memorandum opinion and order granting plaintiffs' motion for class certification) ("All persons . . . whose benefits have been terminated, suspended or reduced since June 27, 1998 . . . .").

accept such temporary benefits pending Government Defendants' compliance in lieu of their

salaries, *see* Pls.' Opp'n to Gov't Defs.' Mot. to Stay (Plaintiffs do not object to this exclusion).

However, the September 24, 2004, reinstatement remedy still applies to class members who are

otherwise eligible even if those claimants sought review of termination decisions on

reconsideration or appeal.  Indeed, seeking such reinstatement should not disqualify any class

member from reinstatement when the reconsideration procedures themselves are the very source

of the constitutional and DCAPA violations for many class members.  The Court does note that

by remanding the duty of crafting and promulgating valid rules to Government Defendants, it had

expected Government Defendants to undertake these kind of decisions in consultation with

Plaintiffs.[10]

## IV:  CONCLUSION

For the reasons set forth above, the Court shall deny Government Defendants' Motion to

Reconsider.  To the extent that the Court's Opinion has clarified certain aspects of its September

24, 2004, Opinion and Order, Government Defendants' Motion to Clarify is granted.  The Court

---

[10] Additionally, Government Defendants correctly note that "[n]amed Plaintiff Jamal Rashad has filed no oppositions to our pending motions concerning the Court's September 24, 2004, Order" and ask the Court to treat their motions as conceded as to Mr. Rashad.  Gov't Defs.' Reply to Pls.' Opp'n to Gov't Defs.' Mot. to Reconsider at 12 n.17.  To clarify, on September 24, 2004, in a separate order, the Court permitted class counsel to withdraw as attorney for Mr. Rashad, as he had requested.  On October 8, 2004, attorney Kirk Williams entered an appearance on Mr. Rashad's behalf, but did not respond to any of Government Defendants' motions.  It is noteworthy that Mr. Rashad was represented by class counsel during the last round of briefing, under which the Court issued its September 24, 2004, Opinion and Order.  Because this Opinion does not alter any of that ruling's findings or conclusions, the Court will not treat any issue as conceded by Mr. Rashad.  The Court does note that a problem certainly might have existed for Mr. Rashad had the Court significantly altered its findings or conclusions, and cautions Mr. Rashad not to neglect his duties to respond to future filings, especially those that may relate to individualized determination arguments, even though he remains a member of the broader class.

finds Government Defendants' Motion to Stay the Court's September 24, 2004, Opinion and

Order "pending a decision on Government Defendants' Motion for Reconsideration" to be moot

given the fact that (1) the Court is now issuing a decision of the Motion to Reconsider, and (2) all

evidence indicates that Government Defendants have refused to implement the Court's findings

in the interim.  An Order accompanies this Memorandum Opinion.


Date:   January 28, 2005


                                          _____/s/_____
                                          COLLEEN KOLLAR-KOTELLY
                                          United States District Judge