# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CHANELL LIGHTFOOT, as Personal
Representative of the Estate of Elizabeth
Lightfoot, *et al.*,

      *Plaintiffs*,

    v.

DISTRICT OF COLUMBIA, *et al.*,

      *Defendants*.

Civil Action No. 01-01484 (CKK)

## MEMORANDUM OPINION
(January 10, 2011)

Currently pending before the Court is the [510] Second Motion to Decertify the Class filed by the District of Columbia (the "District"), joined in by CLW/Creative Disability Management ("CLW/CDM") (collectively, "Defendants"). Plaintiffs, a class of former employees of the District, first commenced this action in July 2001 asserting a variety of claims challenging the policies and procedures that the District applied to terminate, suspend, and modify disability compensation benefits. Over the years, Plaintiffs' claims have been successively winnowed down by orders of this Court as well as the Court of Appeals for the District of Columbia Circuit. Today, the action focuses on a single cause of action—namely, whether Defendants, in applying the relevant statutory and regulatory framework, terminated[1] disability compensation benefits without affording beneficiaries adequate and timely notice and an opportunity to respond, in violation of the Due Process Clause of the Fifth Amendment (the

---

[1] Mindful of the difference between terminations, suspensions, and modifications, the Court shall use "terminations," or some variant thereof, as a shorthand for all three types of adverse actions.

"Due Process Clause").  Because the continued certification of the class is no longer appropriate, the Court shall GRANT the District's [510] Second Motion to Decertify the Class.

## I. BACKGROUND

The Court assumes familiarity with its prior opinions in this action, which set forth in detail the history of this case, and shall therefore only address the factual and procedural background necessary to address the issues currently before the Court.

### A.    The Scope of the Action Today

Plaintiffs, a class of former employees of the District, first commenced this action in July 2001 asserting eight claims directed towards challenging the policies and procedures that the District applied to terminate disability compensation benefits pursuant to the Comprehensive Merit Personnel Act of 1978 (the "CMPA"), D.C. Code §§ 1-601.01 *et seq.  See* Compl., Docket No. [1].  On September 24, 2004, this Court granted Plaintiffs' motion for partial summary judgment as to two of Plaintiffs' claims, which alleged that Defendants' failure to adopt written standards governing the termination of benefits violated the Due Process Clause (one of several claims asserted by Plaintiffs under the Due Process Clause) and the District of Columbia Administrative Procedure Act (the "DCAPA").  *See Lightfoot v. District of Columbia*, 339 F. Supp. 2d 78 (D.D.C. 2004), *rev'd*, 448 F.3d 392 (D.C. Cir. 2006).  On appeal, the Court of Appeals for the District of Columbia Circuit (the "D.C. Circuit") reversed this Court's decision as it pertained to Plaintiffs' claim under the Due Process Clause, and remanded the DCAPA claim for reconsideration as to whether the exercise of supplemental jurisdiction over that claim was appropriate.  *See Lightfoot v. District of Columbia*, 448 F.3d 392 (D.C. Cir. 2006).

On remand, on January 16, 2007, this Court granted Defendants' motion to dismiss three

of Plaintiffs' claims arising under the Due Process Clause, which included challenges to the sufficiency of the notices accompanying Defendants' termination decisions and the adequacy of their decisionmaking. *See Lightfoot v. District of Columbia*, No. 01 Civ. 1484, 2007 WL 148777 (D.D.C. Jan. 16, 2007). The Court also declined to exercise supplemental jurisdiction over Plaintiffs' DCAPA claim. *Id.* Subsequently, on April 10, 2007, the Court granted Defendants' supplemental motion to dismiss Plaintiffs' claim mounting a facial challenge to the CMPA, a claim predicated on the contention that the statute was itself violative of the Due Process Clause. *Lightfoot v. District of Columbia*, No. 01 Civ. 1484, 2007 WL 1087474 (D.D.C. Apr. 10, 2007).

As a result of all this motion practice, the locus of this case is now a single cause of action—an "as-applied" challenge to Defendants' administration of the CMPA, rooted in principles of procedural due process. Specifically, Plaintiffs contend as follows:

> [As the CMPA] was applied, Defendants reduced, suspended or terminated disability compensation benefits . . . without affording beneficiaries adequate and timely notice and opportunity to demonstrate a continuing entitlement to benefits in violation of the Due Process Clause.

4th Am. Compl., Docket No. [412], ¶ 95.[2] To prevail on their claim, Plaintiffs must establish, *inter alia*, that the class was denied due process across the board.

---

[2] Plaintiffs also retain a separate claim against CLW/CDM, based on the contention that CLW/CDM "materially breached its contract with the government to which Plaintiffs are direct intended third-party beneficiaries." 4th Am. Compl. ¶ 97. Because the viability of Plaintiffs' breach of contract claim against CLW/CDM turns, in part, on the factual issues underlying Plaintiffs' sole remaining Due Process Clause claim, the focus of the parties' attention has been on the Due Process Clause claim. In any event, for purposes of the class certification question, it is undisputed that CLW/CDM was only delegated the authority to manage the District's disability compensation benefits program for a shade less than three years of the six-year, nine-month class period. Unsurprisingly, the parties do not address the claim in the context of the present motion for class decertification, and the Court shall adopt the same approach.

*B.     Class Certification Proceedings*

The Court initially certified the class in this action on January 14, 2004. *See* Order (Jan. 14, 2004), Docket No. [153]. In April 2005, this Court ordered Defendants to identify all class members. *See* Order (Apr. 11, 2005), Docket No. [227]; Order (Apr. 26, 2005), Docket No. [230]. In response, the District engaged an outside contractor to compile a list of class members, ultimately providing Plaintiffs with a list of approximately 5,052 potential class members. Thereafter, the District determined that the initial list was overly broad and reduced the number of class members to 548. For their part, Plaintiffs maintained that the class lists prepared by the District were both over- and under-inclusive.

Following remand from the D.C. Circuit, the parties' attempts to conduct discovery as to Plaintiffs' remaining procedural due process claim soon unraveled due to disagreements over the composition of the class list. The District proposed to conduct an audit of the class list, while Plaintiffs proposed reviewing a statistically significant number of case files to create a common factual predicate for assessing Plaintiffs' claim. *See* Pls.' Status Report (Apr. 11, 2007), Docket No. [331]. The parties proceeded with Plaintiffs' proposal, until the District determined that the sampling process had inappropriately shifted the burdens of discovery. *See* Defs.' Status Report (Apr. 12, 2007), Docket No. [332].

On April 17, 2007, taking into account intervening amendments to the CMPA that precluded the possibility of prospective relief, the Court modified the class definition to exclude individuals whose benefits were terminated after April 5, 2005, the date on which the amendments came into effect. *See* Order (Apr. 17, 2007), Docket No. [333]. As modified, the class—certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure—is defined as

follows:

> All persons who received disability compensation benefits pursuant to D.C. Code § 1-623.1, *et seq.* and whose benefits were terminated, suspended or reduced between June 27, 1998 and April 5, 2005, the date on which the Disability Compensation Effective Administration Amendment Act of 2004, D.C. Act 15-685, 52 D.C. Reg. 1449 (Jan. 4, 2005), took effect. "Disability compensation benefits" is defined to exclude a scheduled award provided in D.C. Code § 1-623.7 expiring at the end of the statutory term, continuation of pay provided in D.C. Code § 1-623.18(a) expiring at the end of the statutory term, funeral expenses provided in D.C. Code § 1-623.34, a fully paid lump sum settlement provided in D.C. Code § 1-623.35, and credited compensation leave provided in D.C. Code § 1-623.43.

*Id.* at 1-2. The Court also ordered the parties to devise a means of creating an accurate class list. *See* Order (Apr. 17, 2007), Docket No. [334].

On May 10, 2007, the Court ordered the District to show cause why the parties should not be directed to retain an outside vendor capable of compiling an accurate class list and developing a statistically significant sample of the class records to be used as a factual predicate in addressing Plaintiffs' remaining procedural due process claim. *See* Order (May 10, 2007), Docket No. [338]. Instead, on May 31, 2007, Defendants filed their first motion to decertify the class, challenging each of the requirements for class certification under Rule 23. *See* Defs.' Mot. to Decertify the Class, Docket No. [342].

On November 15, 2007, the Court denied Defendants' first motion to decertify the class. *See Lightfoot v. District of Columbia*, 246 F.R.D. 326 (D.D.C. 2007). Among other things, the Court observed that, in order to prevail on their procedural due process claim, Plaintiffs were not tasked with establishing constitutional violations for particular individuals, but rather would "be required to prove that 'as a matter of policy and normal practice,' beneficiaries were not afforded adequate notice and opportunity to be heard before their benefits were modified." *Id.* at 336. In

upholding the continued certification of the class, this Court emphasized that Plaintiffs

maintained that Defendants "applied a *common set* of unwritten policies and practices to *all*

*individuals*." *Id.* at 341 (emphasis added). The Court presumed that Plaintiffs' evidence to this

effect would be based on a compilation of data regarding the process afforded class members, but

never strayed from the overarching principle that, "[t]o succeed, Plaintiffs must prove that the

alleged due process violation occurred *across the board*," *id.* (emphasis added), a formulation

derived in part from Circuit Judge Laurence H. Silberman's concurring opinion on appeal, which

noted that whether a government actor's process is constitutionally adequate is to be determined

with reference to "the run-of-the-mine cases and not every application," *Lightfoot*, 448 F.3d at

402 (Silberman, J., concurring).

Following the denial of Defendants' first motion for decertification, the parties returned

to the process of assembling a common class list and collecting case files for potential class

members. Defendants also deposed two of the representative Plaintiffs. The Court again ordered

Defendants to certify a class list, and directed the parties to proceed from an agreed-upon

universe of class members in presenting their arguments as to liability. *See* Min. Order (Feb. 28,

2008); Order (Mar. 4, 2008), Docket No. [371]. The process was a tortured one and consumed

substantial time and resources of the parties and this Court. Suffice it to say that, to the list of

individuals initially certified by the District, the parties added individuals known to Plaintiffs and

incorporated records subsequently discovered by the District to form "*the* definitive list of

potential class members for the purposes of liability." Order (Dec. 22, 2009), Docket No. [498],

at 1 (emphasis in original).

On January 29, 2010, Plaintiffs filed a motion for summary judgment. *See* Pls.' Mem. in

Supp. of Pls.' Renewed Mot. for Summ. J. on Liability ("Pls.' Summ. J. Mem."), Docket No.

[506-32]. On March 1, 2010, Defendants filed an opposition. *See* Defs.' Opp'n to Pls.'

Renewed Mot. for Summ. J. ("Defs.' Summ. J. Opp'n"), Docket No. [524]. On March 17, 2010,

Plaintiffs filed a reply. *See* Pls.' Reply to Defs.' Opp'n to Pls.' Renewed Mot. for Summ. J.

("Pls.' Summ. J. Reply"), Docket No. [532]. That motion is fully briefed and remains pending.

Concurrently with the briefing of Plaintiffs' motion for summary judgment, the parties

briefed the present motion for class decertification. The District filed its opening papers on

February 8, 2010. *See* Defs.' Mem. in Supp. of Defs.' Second Mot. to Decertify the Class

("Defs.' Mem."), Docket No. [510]. Subsequently, CLW/CDM filed a notice indicating that it

joined in the District's motion. *See* CLW/CDM's Notice of Joining the Defs.' Second Mot. to

Decertify the Class, Docket No. [512]. On February 12, 2010, Plaintiff filed an opposition. *See*

Pls.' Opp'n to Defs.' Second Mot. to Decertify the Class ("Pls.' Opp'n"), Docket No. [511]. On

February 17, 2010, the Defendants filed their reply. *See* Defs.' Reply to Pls.' Opp'n to Defs.'

Second Mot. to Decertify the Class, Docket No. [514].[3] The matter is now fully briefed and ripe

for adjudication.

## II. LEGAL STANDARDS

This action implicates core constitutional rights, the statutory remedies therefor, the scope

of municipal liability under federal law, and complex class action practice. As a result, the

universe of legal principles potentially involved in this action is broad indeed. The Court need

---

[3] The parties have also filed a variety of errata and supplemental papers relating to this motion and other outstanding motions. For purposes of economy, the Court shall not cite to those documents here, but notes that it renders its decision today upon the parties' submissions, the attachments thereto, and the record as a whole.

not—and does not—seek to map the intricacies of this universe here. However, because it shall inform the Court's resolution of the immediate motion for decertification, the Court begins with an overview of the substantive law governing Plaintiffs' remaining procedural due process claim, turning thereafter to the procedural framework governing the class certification question. Before proceeding further, the Court pauses to observe that its ruling today comes on the heels of nearly a decade of litigation; as a result, the decision is necessarily confined to the specific, and well-developed, record in this action.

### A.  *Municipal Liability Under Section 1983*

Plaintiffs' claim arises under Section 1 of the Ku Klux Act of 1871, Rev. Stat. § 1979, as amended, 42 U.S.C. § 1983 ("Section 1983"), which provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. Where, as here, the plaintiff seeks to hold a municipality liable under Section 1983, the inquiry divides into two: the plaintiff must first establish a predicate constitutional violation; thereafter, the plaintiff must establish that a "policy or custom"[4] of the municipality caused the constitutional violation. *Brown v. District of Columbia*, 514 F.3d 1279, 1283 (D.C. Cir. 2008). "Each inquiry is separate and serves different purposes." *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003). At the first stage, "[a]ll that is being

---

[4]  The phrase "policy or custom" is commonly deployed as a shorthand for the full ambit of municipal action that may lead to liability under Section 1983, a usage that the Court adopts here.

established . . . is that there is some constitutional harm suffered by the plaintiff, not whether the municipality is liable for that harm." *Id.*

> 1.     The Predicate Constitutional Violation: Procedural Due Process

Plaintiffs' Section 1983 claim is predicated upon an alleged violation of the Due Process Clause, which provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." As the Supreme Court observed long ago, "[m]any controversies have raged about the cryptic and abstract words of the Due Process Clause," *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950), and this case is no exception.

There are three basic elements to a procedural due process claim: there must be (1) a deprivation; (2) of life, liberty, or property; (3) without due process of law. *Propert v. District of Columbia*, 948 F.2d 1327, 1331 (D.C. Cir. 1991). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). However, it is equally fundamental that due process is "not a technical conception with a fixed conception unrelated to time, place and circumstances;" rather, it is "flexible and calls for such procedural protections as the particular situation demands." *Id.* at 334.

Consistent with these principles, "[t]he precise form of notice and the precise kind of hearing required [in a given circumstance] depend[] upon a balancing of the competing public and private interests involved." *Propert*, 948 F.2d at 1332. In determining what process is due, three distinct factors are considered—commonly referred to as the "*Mathews* factors," a reference to the Supreme Court decision in which they were first articulated:

> First, the private interest that will be affected by the official action;
> second, the risk of an erroneous deprivation of such interest through

9

> the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335. "Depending on the tilt of the *Mathews* balance in a particular case, the usual requirement of written notice may be relaxed, and the timing and content of the hearing may vary." *Propert*, 948 F.2d at 1332 (internal citation omitted); *see also Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434 (1982) ("[T]he timing and nature of the required hearing will depend on appropriate accommodation of the competing interests involved") (internal quotation marks omitted). Given the intensely fact-based nature of the inquiry, the Supreme Court has chastised courts that have adopted a "sweeping and categorical" approach to the Due Process Clause. *Gilbert v. Homar*, 520 U.S. 924, 931 (1997).

### 2. Municipal Liability: "Policy or Custom"

At the second stage, the plaintiff must establish that a "policy or custom" caused the alleged predicate constitutional violation. *Baker*, 326 F.3d at 1306. The inquiry again divides into two: the plaintiff must first establish the existence of a "policy or custom"; thereafter, the plaintiff must establish a causal link between the "policy or custom" and the alleged constitutional harm.

### a. "Policy or Custom"

In the first instance, the plaintiff must "identify and define the particular policy or custom at issue; only then can the more difficult question of whether such a policy or custom existed be addressed." *Cox v. District of Columbia*, 821 F. Supp. 1, 11 (D.D.C. 1993). Beginning with the Supreme Court's seminal decision in *Monell v. Department of Social Services of City of New*

*York*, 436 U.S. 658 (1978), courts have identified a variety of ways that a municipality may adopt a "policy or custom" sufficient to support municipal liability. Common to all is the overarching principle that a municipality may be held liable under Section 1983 only for its own violations of federal law. *Los Angeles Cnty., Cal. v. Humphries*, __ U.S. __, 131 S. Ct. 447, 452 (2010).

Mindful that their boundaries may be porous and that courts should avoid unnecessary formalism in approaching the subject, there are four basic categories of municipal action sufficient to support liability under Section 1983. These include:

1. **Express Municipal Policy:** The first basis for municipal liability is also the least controversial: a municipality may be held liable where it expressly adopts an official policy that results in the alleged constitutional harm. *Baker*, 326 F.3d at 1306; *see also Monell*, 436 U.S. at 690 (a municipality may be held liable where "the action . . . implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the local governing] body's officers.").

2. **Adoption by Municipal Policymakers:** Municipal liability may also lie where the constitutional harm may be tied to the actions of a municipal "policymaker," *Baker*, 326 F.3d at 1306, a category confined to those "persons who have 'final policymaking authority [under] state law,'" *Triplett v. District of Columbia*, 108 F.3d 1450, 1453 (D.C. Cir. 1997) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion) ("[T]he authority to make municipal policy is necessarily the authority to make *final* policy.") (emphasis in original). This well-reasoned rule effectively extends municipal liability to reach the acts of those individuals "whose edicts or acts may fairly be said to represent official policy." *Monell*, 436 U.S. at 694.

3. **Custom or Usage:** Additionally, a municipality may be "sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the [local governing] body's official decisionmaking channels." *Monell*, 436 U.S. at 690-91. Generally speaking, liability under this category is confined to those practices that have become "so permanent and well settled as to constitute 'custom or usage.'" *Id.* at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)).

4. **Deliberate Indifference:** Closely related to and in many instances indistinguishable from the concept of municipal custom, "deliberate indifference" may also support municipal liability under Section 1983. The critical question here is whether the

government has failed "to respond to a need . . . in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations." *Baker*, 326 F.3d at 1306. The inquiry is an objective one—the factfinder must ask "whether the municipality knew or should have known of the risk of constitutional violations." *Id.* at 1307 (citing *Farmer v. Brennan*, 511 U.S. 825, 841 (1994)). Mere negligence does suffice: the doctrine "does *not* require the city to take reasonable care to discover and prevent constitutional violations," but "simply means that, faced with actual or constructive knowledge that its agents will probably violate constitutional rights, the city may not adopt a policy of inaction." *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004) (emphasis in original).

Absent an express official policy, a municipal "policy or custom" is considerably easier to define than it is to prove. *Carter v. District of Columbia*, 795 F.2d 116, 122 (D.C. Cir. 1986). Although the evidentiary standard is often described as "exacting," *Robinson v. District of Columbia*, 403 F. Supp. 2d 39, 56 (D.D.C. 2005), the measure and type of proof required "is not easy to quantify," *Cox*, 821 F. Supp. at 13. Statistics may be relevant, but there are no "numerical standard[s] control[ling] the determination of whether incidents of wrongful behavior cumulatively show a pattern amounting to a custom or policy." *Carter*, 795 F.2d at 124. The plaintiff must "present concentrated, fully packed, precisely delineated scenarios," *Parker v. District of Columbia*, 850 F.2d 708, 712 (D.C. Cir. 1988) (internal quotation marks omitted), *cert. denied*, 489 U.S. 1065 (1989), and without further context, isolated "statistical evidence alone may not justify [the factfinder's determination] that a municipal policy or custom authorizes or condones the unconstitutional acts," *Merman v. City of Camden*, __ F. Supp. 2d __, 2010 WL 2521422, at *7 (D.N.J. June 15, 2010) (citing *Strauss v. City of Chicago*, 760 F.2d 765, 768, 69 (7th Cir. 1985)). Further, while particularly "[e]gregious instances of misconduct, relatively few in number but following a common design, may support an inference that the instances would not occur but for municipal tolerance of the practice in question," even a

"catalog of disquieting events is not sufficient to demonstrate a pervasive pattern" where the "occurrences . . . do not coalesce into a discernible 'policy.'" *Carter*, 795 F.2d at 123-24.

### b. Causation

Once a municipal "policy or custom" has been established, a second, "even more difficult" obstacle must be overcome. *Cox*, 821 F. Supp. at 17. The plaintiff bears the burden of demonstrating an "'affirmative link,' such that a municipal policy was the 'moving force' behind the constitutional violation." *Baker*, 326 F.3d at 1306 (citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)). Although there are various formulations of the degree of causation required, the "substantial factor" test is the most common. *Cox*, 821 F. Supp. at 18.

### B. *Class Certification Under Rule 23*

Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure. To justify certification, each of the elements of Rule 23(a) must be met. *Richards v. Delta Air Lines, Inc.*, 453 F.3d 525, 529 (D.C. Cir. 2006). The four prerequisites to a class action under Rule 23(a) are:

1. **Numerosity:** The class is so numerous that joinder of all members is impracticable;

2. **Commonality:** There are questions of law or fact common to the class;

3. **Typicality:** The claims or defenses of the representative parties are typical of the claims and defenses of the class; and

4. **Adequacy:** The representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Additionally, the proponents of class certification must demonstrate that the class is maintainable under one of the subdivisions of Rule 23(b). In the instant case, the class was certified pursuant to Rule 23(b)(2), which requires a showing that "the party opposing

the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2). In the end, the question of whether the requirements for class certification have been met is entrusted to the sound discretion of the district court, which is "uniquely well situated to rule on class certification matters." *Garcia v. Johanns*, 444 F.3d 625, 631 (D.C. Cir. 2006) (internal quotation marks omitted).

### III. PRELIMINARY ISSUES

Before proceeding to the merits of the present motion, the Court must first address Plaintiffs' contention that it is inappropriate for this Court to revisit its prior certification rulings. Pls.' Opp'n at 9-12. The Court disagrees.

>    A.    *Rule 23 Authorizes District Courts to Assess the Propriety of Continued*
>          *Certification as the Action Develops*

Rule 23 expressly allocates to district courts the discretion to determine whether a class should be certified in the first instance, and to revisit the propriety of continued certification during the pendency of the action. *See* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."). Indeed, the Supreme Court has described certification orders as "inherently tentative," and, as such, the district court "remains free to modify [such orders] in the light of subsequent developments in the case." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982). In fact, as the "gatekeeper" in the certification context, district courts may abuse their discretion by failing to revisit their preliminary certification decisions where continued certification is no longer appropriate. *See Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 140 (3d Cir. 1998) ("[C]ourts are required to reassess their class rulings as the case develops."), *cert. denied*, 526 U.S. 1114 (1999). Accordingly, the

14

Court does not consider the matter foreclosed merely because it has issued prior opinions concerning certification in this action.

      B.     *Developments in this Action Counsel in Favor of Revisiting the Certification of the Class*

Significantly, the procedural posture of this action is markedly different than it was when the Court last addressed the certification question. When the Court denied Defendants' first motion to decertify the class—in November 2007—the parties' arguments were focused on the class allegations set forth in the Complaint, brief submissions by the parties clarifying the nature of the relief sought in this action, and relatively generalized information concerning the representative Plaintiffs. *See generally Lightfoot*, 246 F.R.D. at 330-32. At that point in time, the great bulk of discovery in this action still lay in the future. Accordingly, while the Court presumed that Plaintiffs' evidence in support of their procedural due process claim would "be based on a compilation of data regarding the process afforded various class members," neither the parties nor the Court had the benefit of having seen that data. *Id.* at 336. Indeed, the parties were yet to gather the full universe of claims files that would be used for purposes of determining liability.

The same is not true today. After the Court denied Defendants' first motion for decertification, the parties assembled a common class list and collected case files for class members. Plaintiffs, moreover, filed their motion for summary judgment, which provides the clearest picture of how Plaintiffs perceive the class and how they intend to prove their case. In short, the Court now has the benefit of a significantly more developed evidentiary record, as well as a more concrete sense of the nature of the claims and defenses remaining in this action. In many ways, this is the paradigm of how the interests of class members may crystallize and come

into focus during the course of litigation.[5]  Based upon these developments, the Court considers it eminently sensible to revisit the certification question at this stage of the proceedings.  For the reasons set forth in detail below, these developments have cast considerable doubt on the viability of the continued certification of the class.  *See Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 579 (9th Cir. 2010) (if evidence unavailable at the time of certification disproves the contention that certification is appropriate, the district court has the authority to decertify the class), *cert. granted in part*, __ S. Ct. __, 2010 WL 3358931 (Dec. 6, 2010).

Plaintiffs object that "the only new development" in this action is their motion for summary judgment, and cite to *Eisen v. Carlisle & Jacquelin*, 417 U.S. 157 (1974), for the proposition that the "merits inquiry and class certification analysis must be kept separate."  Pls.' Opp'n at 12.  Plaintiffs misunderstand the Supreme Court's decision in *Eisen*.  "Nothing in *Eisen* precludes a court from scrutinizing plaintiffs' legal causes of action to determine whether they are suitable for resolution on a classwide basis;" in fact, such scrutiny is "an essential ingredient of the determination whether to allow a case to proceed as a class action."  *McCarthy v. Kleindienst*, 741 F.2d 1406, 1412 n.6 (D.C. Cir. 1984).  Generally speaking, the class certification question often "involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action," *Richards*, 453 F.3d at 530 n.5 (internal quotation marks omitted), and the mere fact that a requirement for class certification "might overlap with an issue on the merits" does not vitiate the district court's obligation to ensure that the requirement is met, *In re Initial Public Offerings Secs. Litig.*, 471 F.3d 24, 27 (2d Cir. 2006);

---

[5]  The present procedural posture of this case also counsels against the uncritical reliance upon authorities addressing the certification question at earlier stages of litigation.

*see also Agostino v. Quest Diagnostics Inc.*, 256 F.R.D. 437, 449 (D.N.J. 2009) (district court must resolve disputes relevant to class certification, even if they overlap with the merits). Indeed, district courts are required to conduct a "rigorous analysis" to ensure that all the requirements of class certification are satisfied, and "[a]ctual, not presumed, conformance" is indispensable. *Falcon*, 457 U.S. at 160-61.[6]

Plaintiffs' remaining authorities do not compel a different course. For example, in *Slaven v. BP Am., Inc.*, 190 F.R.D. 649, 651-52 (C.D. Cal. 2000), the court found that, given the district court's special procedural role in supervising the maintenance of a class action, the "usual reluctance to entertain motions for reconsideration simply does not apply," and also rejected the argument that decertification was inappropriate on the basis that the plaintiffs in that case had "relied upon their class status for more than five years," noting that no party has a right to proceed by class action where the requirements of Rule 23 are not satisfied. Regardless, to the extent Plaintiffs' authorities stand for the proposition that the party seeking decertification must, in the first instance, be able to point to specific facts calling into doubt the viability of continued certification, Defendants have discharged that burden. Nevertheless, "[a]s the proponent of continued class certification, Plaintiffs [retain] the burden of establishing that each of the

---

[6] At the same time, district courts must refrain from making determinations on the merits that are unnecessary to resolving the class certification question. Most notably for our purposes here, although there is no *per se* rule foreclosing courts from assessing the soundness of evidence proffered by the proponents of the class, "disputes over whose statistics are more persuasive" are generally not amenable to resolution in the class certification context. *See, e.g.*, *Hnot v. Willis Grp. Holdings Ltd.*, 241 F.R.D. 204, 210 (S.D.N.Y. 2007). The precise circumstances of when a court may properly probe behind the merits of statistical analyses are not altogether clear; however, because the Court concludes that continued certification is inappropriate even crediting Plaintiffs' data, the Court need not, and does not, reach this question here. However, the risk of crossing the line into improper factfinding is not as pronounced in this setting as it may be in others, given the advanced procedural posture of the case.

requirements for class certification . . . are met." *Lightfoot*, 246 F.R.D. at 332 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997)). The Court shall now turn to the question of whether Plaintiffs have met that burden.

## IV. DISCUSSION

Defendants challenge the continued certification of the class on a variety of fronts, questioning Plaintiffs' ability to satisfy two of the four requirements under Rule 23(a)—namely, commonality and typicality—and the basis for certification under Rule 23(b)(2). In the course of briefing this motion, the parties have raised several difficult and somewhat novel questions as to how the class action device operates at the intersection of procedural due process and municipal liability at an advanced stage of the litigation. The Court reiterates that its decision today is limited to the unique facts before it, and comes on the heels of nearly a decade of litigation. Based on this extended history and the well-developed record in this action, the Court concludes that Plaintiffs can satisfy neither the "commonality" requirement of Rule 23(a)(2) nor the "cohesiveness" requirement of Rule 23(b)(2). The Court need not—and shall not—reach Defendants' remaining arguments in favor of decertification.

### A. Plaintiffs Have Failed to Satisfy the "Commonality" Requirement of Rule 23(a)(2)

Class relief is "'peculiarly appropriate' when the 'issues involved are common to the class as a whole' and when they 'turn on questions of law applicable in the same manner to each member of the class.'" *Falcon*, 457 U.S. at 155 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979)). As a result, to invoke the class action device, there must be questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). Broadly speaking, the test for "commonality" is met where there is "at least one issue, the resolution of which will affect all or a significant

number of the putative class members." *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 26 (D.D.C. 2001) (internal quotation marks omitted). The inquiry, however, is complicated where, as here, the proffered "common issue" is a somewhat amorphous claim of systemic or widespread misconduct on the part of the defendant. On the one hand, "factual variations among the class members will not defeat the commonality requirement, so long as a single aspect or feature of the claim is common to all proposed class members.'" *Bynum v. District of Columbia*, 214 F.R.D. 27, 33 (D.D.C. 2003). On the other hand, "[m]ere allegations of systemic violations of the law . . . will not automatically satisfy Rule 23(a)'s commonality requirement." *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1195 (10th Cir. 2010); *see also Reinholdson v. Minnesota*, No. 02 Civ. 795, 2002 WL 31026580, at *8 (D. Minn. Sept. 9, 2002) ("The reciting of the word 'systemic' in mantra-like fashion . . . does not overcome the prerequisites to class certification."), *vacated in part on other grounds*, 346 F.3d 847 (8th Cir. 2003). Here, contrary to Plaintiffs' suggestion, the myriad fissures within the class are not mere "[t]rivial differences among class members," Pls.' Opp'n at 15, but rather raise substantial questions as to whether Plaintiffs can satisfy the "commonality" requirement of Rule 23(a).

      1.    <u>Plaintiffs, Relying Upon an Untenable Characterization of their Claim, Have Failed to Identify a "Policy or Custom" Common to the Class</u>

In opposition to the present motion, Plaintiffs characterize the "common issue" as follows:

> Claim Two alleges that the Defendants had a policy and practice of failing to provide members of the Plaintiff class Due Process prior to the termination of their disability compensation benefits. Such process requires both a notice and an opportunity to respond to a proposed deprivation of property before the Government terminates, suspends or reduces benefits. This, plainly, is a common issue affecting all members of the class as presently defined, and class

treatment of this common issue is appropriate.

Pls.' Opp'n at 12.[7]  Consistent with this sweeping statement, Plaintiffs elsewhere contend that "the question is whether the Defendants generally applied termination policies and procedures consistent with the demands of *Mathews.*"  *Id.* at 17.  And, in the same vein, Plaintiffs broadly aver that "the policy pursued by the Defendants was to deprive the class of pre-deprivation process."  *Id.* at 38.  In each instance, Plaintiffs' allegations reduce to an empty invocation of the legal standard governing procedural due process claims generally—indeed, Plaintiffs repeatedly assert that Defendants' policy actually was to violate the Due Process Clause.

From this perspective, Plaintiffs' proffered "common issue" is a perfect illustration of the D.C. Circuit's sensible observation that, "at a sufficient[] [] level of generalization, almost any set of claims can be said to display commonality."  *Love v. Johanns*, 439 F.3d 723, 729 (D.C. Cir. 2006) (quoting *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998)).  In *Love*, the putative class—a group of female farmers—alleged the existence of a broad-based "pattern or practice" of gender discrimination in the disposition of agricultural loan applications.  *Love*, 439 F.3d at 729.  The Court rejected the notion that the "commonality" requirement could be satisfied simply by pointing to the question of whether the defendant had violated the Equal Credit Opportunity Act ("ECOA"), reasoning that, if that were the test, every plaintiff in an ECOA action would be entitled to certification.  *Id.*  The same logic applies here.  Under Plaintiffs' interpretation, certification would be appropriate wherever class members allege a harm with some connection to the Due Process Clause—no matter how disparate the class members'

---

[7] Elsewhere, Plaintiffs have alleged that "Defendants administered the program without . . . consistently applied policies, procedures and standards."  4th Am. Compl. ¶ 93.

individual injuries may be and no matter their origins. In essence, plaintiffs would be free to aggregate any adverse action that might conceivably constitute a due process violation in order to secure class certification against a particular defendant.[8] And, if classes of such extraordinary breadth were to proceed to a disposition on the merits, the district court would effectively be forced into the uncomfortable position of relying upon the "sweeping and categorical" approach to the Due Process Clause rejected by the Supreme Court. *Gilbert*, 520 U.S. at 931. Stated differently, plaintiffs would be free to certify classes without establishing a sufficient nexus between the class claims and the "run-of-the-mine" instances of due process violations. *Lightfoot*, 448 F.3d at 402 (Silberman, J., concurring).

There is a related problem. Viewed from a slightly different perspective, Plaintiffs' overly generalized characterization of the "common issue" in this action obscures the fact that they have, at the same time, flipped the underlying substantive legal standard on its head. In order to establish municipal liability under Section 1983, the first task is to "identify and define the particular policy or custom at issue." *Cox*, 821 F. Supp. at 11. Plaintiffs, in contrast, seek to conflate a wide variety of practices and impute them to the class as a whole by collecting them under a single, unilluminating umbrella of "systemic" failures. *See J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1289 (10th Cir. 1999) (criticizing plaintiffs' "attempt to broadly conflate a variety of claims to establish commonality via an allegation of 'systematic failures.'"); *cf. Doe v. N.Y.C. Dep't of Social Servs.*, 670 F. Supp. 1145, 1169 (S.D.N.Y. 1987) (refusing to expand class to

---

[8] Plaintiffs' interpretation is particularly problematic in light of their separate contention that Rule 23(b)(2) does not incorporate a requirement that the class be "cohesive," a proposition this Court rejects for reasons stated elsewhere. *See infra* Part IV.B. However, were Plaintiffs to have their way on both accounts, there would be virtually no procedural check ensuring that class members' claims are, fundamentally, of the same kiln.

encompass secondary objections to the constitutionality of municipality's practices). That is, lurking behind the rather vague and conclusory statement that Defendants had a "policy and practice of failing to provide members of the Plaintiff class Due Process," Pls.' Opp'n at 12, lies a wide variety of more discrete and particularized practices that could conceivably serve as the foundation for municipal liability. These include, but are not limited to: the failure to provide any pre-deprivation notice; the failure to provide a sufficient "grace period" between pre-deprivation notice and actual termination; the failure to provide an adequate explanation of the reasons for termination decisions; the failure to provide adequate notice of procedural rights; the failure to provide claimants with access to case files; and the systematic exclusion of reliable medical evidence. *See generally* Pls.' Summ. J. Mem. As described below in greater detail, *see infra* Part IV.B, these practices do not pervade the class. Indeed, in opposition to the present motion, Plaintiffs never actually attempt to tie any specific practices to the class as a whole (or a substantial part thereof). This is because Plaintiffs have it backwards. The question is not whether a constellation of disparate but equally suspect practices may be distilled from the varying experiences of the class; rather, Plaintiffs must first identify the "policy or custom" they contend violates the dictates of procedural due process and then establish that the "policy or custom" is common to the class. Under Plaintiffs' approach, certification would be appropriate in virtually all actions involving municipal liability under Section 1983, so long as the putative class, through artful pleading, states the challenged "policy or custom" with sufficient generality.[9]

---

[9] These same problems preclude certification under Rule 23(b)(2), under which courts have approached with skepticism efforts to aggregate myriad practices under the guise of "systemic" violations. *Compare Carson P. ex rel. Foreman v. Heineman*, 240 F.R.D. 456, 507 (D. Neb. 2007) (plaintiffs, "challeng[ing] a whole host of [state] action and the various [effects] of those actions," failed to establish they were sufficiently cohesive for purposes of certification

2.     Plaintiffs' Authorities Do Not Require a Different Result

In opposing the present motion, Plaintiffs cite to a number of cases *seriatim*, with minimal, if any, explanation as to how they pertain to the specific facts of this case. One result of Plaintiffs' approach is that the Court is left to guess as to what relevance, if any, Plaintiffs believe these authorities have to the factual circumstances now before the Court. More troubling still, Plaintiffs' approach effectively deprives Defendants of the ability to render a meaningful response. Regardless, nearly all of Plaintiffs' authorities stand principally for the noncontroversial proposition that class members need not have factually identical claims in order to satisfy the "commonality" requirement.[10] To the extent Plaintiffs purport to rely on these authorities for anything beyond that simple proposition, the Court is not convinced that they have any bearing on this case.

For example, several of Plaintiffs' authorities address the "commonality" requirement in the context of suits in antitrust, which are peculiarly well-suited for class resolution because the theories at issue—*e.g.*, price-fixing—relate solely to the defendant's conduct. *In re Lorazepam*, 202 F.R.D. at 29; *see also In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 265 (D.D.C. 2002). In fact, two of the antitrust cases cited by Plaintiffs involved situations where the "commonality" requirement was either undisputed or where the defendant had already been found liable for anti-

---

under Rule 23(b)(2)), *with Dukes*, 603 F.3d at 612 (plaintiffs' factual evidence was targeted towards showing "a single set of corporate policies" applicable to employees nationwide) (emphasis omitted).

[10]  The Court also makes the general observation that nearly all these authorities addressed the certification question at earlier stages of litigation, when the record and the arguments of the parties were significantly less developed than they are at the present procedural posture of this case.

competitive conduct affecting the class. *See Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*, 246 F.R.D. 293, 300 (D.D.C. 2007); *Brown v. Pro Football, Inc.*, 146 F.R.D. 1, 2 (D.D.C. 1992).

Similarly misguided is Plaintiffs' reliance upon actions where the class at issue launched a uniform facial challenge to a statute, regulation, or policy. *See Yamasaki*, 442 U.S. at 701-02 (defendant was statutorily required to grant beneficiaries an oral hearing whenever seeking to recoup overpayments); *Does I-III v. District of Columbia*, 232 F.R.D. 18, 27 (D.D.C. 2005) (plaintiffs challenged a policy—first unwritten and later codified in writing—that failed "on its face" to comply with constitutional requirements and had already been held violative of due process in prior proceedings), *rev'd in part*, 489 F.3d 376 (D.C. Cir. 2007); *Bynum*, 214 F.R.D. at 34 (plaintiffs challenged a policy of incarcerating the putative class members past midnight on the date of their scheduled release from custody; because any overdetention would constitute a harm under the proffered theory, the "length of time of . . . overdetention" was irrelevant); *Pratt v. Bowen*, 642 F. Supp. 883, 886 (D.D.C. 1986) (plaintiffs challenged the validity of agency regulations and interpretive rules).[11]  In contrast to a uniform facial challenge, a more amorphous

---

[11]  Within this genre, the court's decision in *Boulet v. Celluci*, 107 F. Supp. 2d 61 (D. Mass. 2000)—involving a class where the government failed to abide by a statutory mandate to provide Medicaid assistance "with reasonable promptness"—may have some superficial appeal, but that action, critically, turned upon a question of statutory interpretation, and did not involve the flexible, multi-factor balancing test mandated by *Mathews*. *Id.* at 80-81. Moreover, while the court's apparent willingness to delineate a specific time frame for government action is not without some doubt even in the statutory interpretation context, the court, in any event, found certification appropriate only after noting that the amount of time that the plaintiffs had been waiting for benefits—varying from three to ten years—fell far outside the realm of reasonableness. *Id.* at 72; *compare Mercer v. Birchman*, 700 F.2d 828, 835 (2d Cir. 1983) (expressing concern that the class—individuals denied a reasonable opportunity for a hearing to appeal the denial of Medicare benefits— was too broad to satisfy the "commonality" requirement).

claim of systemic or widespread misconduct, such as the claim in this action, is not as obviously susceptible to class-wide treatment.

Several of Plaintiffs' remaining authorities, by illustrating in what circumstances injuries from the same widespread policy or practice may be said to pervade the class and how this case differs, undermine their claimed entitlement to continued certification. For example, in *Pigford v. Glickman*, 182 F.R.D. 341, 349 (D.D.C. 1998)—an action challenging the government's failure to process discrimination complaints—the plaintiffs' claim was predicated on the government's complete dismantling of the administrative vehicle for reviewing complaints, not the facts triggering the complaints in the first place or the particular circumstances accompanying individual denials. Similarly, in certifying a class of paratransit riders, the court in *Disability Rights Council of Greater Wash. v. Wash. Metro. Area Transit Auth.*, 239 F.R.D. 9, 26-27 (D.D.C. 2006), took considerable pains to distinguish the claim at issue with claims that "an entity or individual has discriminated against a broad group of people as a class." There, the putative class sought to enforce a regulatory mandate expressly prohibiting any "operational pattern or practice" rendering paratransit services less adequate than their fixed-route counterparts; under the relevant regulation, the claim at issue was "universal"—either the defendant provided comparable paratransit services or it did not. *Id.* at 26. In other words, the only question was whether the two systems were comparable. Plaintiffs' claim here, if anything, is akin to the more freewheeling discrimination claim.

Two of Plaintiffs' authorities are more problematic. In *Baby Neal v. Casey*, 43 F.3d 48 (3d Cir. 1994), the court apparently sustained certification with respect to a claim challenging wide-ranging deficiencies in the state's foster care system. The plaintiffs' challenge to systemic

25

deficiencies in that case related to legally mandated childcare services, and the court's decision was predicated on the dual findings that "all of the plaintiffs seek to force the [defendant] to comply with its statutory mandates, and [that] all of their injuries . . . would be cured if [defendant] remedied the systemic deficiencies." *Id.* at 61. In a similar vein, *DL v. District of Columbia*, 237 F.R.D. 319, 323 (D.D.C. 2006), does indeed suggest that a "pattern or practice of systemic violation of the pertinent laws" may suffice to meet the "commonality requirement." That opinion, unfortunately, is short on details as to the nature of the alleged "systemic violation," which is unsurprising given that the court addressed the certification question at an earlier stage in the litigation than we are now at in this case. However, it is clear that all of the plaintiffs in that case sought quintessential declaratory and injunctive relief in order to force the defendants to comply with their statutory duty to "identify, locate, and evaluate students with disabilities." *Id.* at 320-21. In each of these cases, the courts faced the certification question in connection with alleged violations of statutorily imposed duties, and at an earlier stage of litigation. Plaintiffs' more amorphous due process claim, which turns on the flexible, multi-factor balancing test mandated by *Mathews*, is not as easily susceptible to class-wide treatment, particularly given the present procedural posture of the case. In any event, to the extent these cases may be read to stand for the proposition that a party may survive a challenge to class certification by aggregating disparate acts of wrongdoing under a generalized guise of "systemic" harm, the Court is not persuaded.

In this regard, the considerably more developed body of case law fashioned in the context of discrimination-focused class actions provides some useful guidance. In that context, courts have engaged in a more searching inquiry where the alleged "common issue" is a broad and

sweeping practice or policy of discrimination. Beginning in *Hartman v. Duffey*, 19 F.3d 1459, 1468 (D.C. Cir. 1994), the D.C. Circuit flatly rejected the once-common practice of allowing plaintiffs to seek class certification simply by launching an "'across-the-board attack' on an employer's entire range of employment decisions." Following *Hartman*, in order to satisfy the "commonality" requirement, the putative class would be required to make a "particularized showing that the employer indeed followed a broad policy of discrimination across different employment decisions." *Id.* at 1469. While "precise congruence" is not required, the challenged practices must nevertheless be substantially similar—the record must permit the "inference that class members suffered a *common* injury." *Id.* at 1471-72 (emphasis in original); *see also Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 975 (5th Cir. 2000) ("[A] 'pattern or practice' must consist of a uniform policy . . . not simply diverse acts in various circumstances."). Stated differently, plaintiffs must "make a significant showing to permit the court to infer that members of the class suffered from a common policy of discrimination that pervaded all of the employer's challenged employment decisions." *Hartman*, 19 F.3d at 1472.

For example, in *Garcia v. Johanns*, 444 F.3d 625 (D.C. Cir. 2006)—a companion case to the *Love* case discussed above—Latino farmers brought suit alleging national origin discrimination in connection with the administration of agricultural loan and disaster benefits. There, the D.C. Circuit affirmed the district court's denial of class certification on the grounds that the plaintiffs "failed to show a *common* facially neutral . . . policy." *Id.* at 634 (emphasis in original); *see also Boyd v. Interstate Brands Corp.*, 256 F.R.D. 340, 359 (E.D.N.Y. 2009) (commonality "requires that the gravamen of the complaint is that defendants discriminated against class members in the same general fashion.") (internal quotation marks and notations

omitted).  The *Garcia* court reiterated that, "[u]nder Rule 23(a)(2), the [plaintiffs] must show that the putative class members have something in common—they all suffered an adverse effect from the same facially neutral policy, and their showing must be significant."  *Garcia*, 445 F.3d at 633 n.10 (internal citation and quotation marks omitted); *accord Taylor v. D.C. Water & Sewer Auth.*, 241 F.R.D. 33, 38 n.5 (D.D.C. 2007), *appeal denied*, 561 F.3d 494 (D.C. Cir. 2009).  Plaintiffs, for their part, fail to show that the class members share a common injury from the same "policy or custom," and instead rely on the mistaken assumption that it suffices to say that a large number of class members appear to have suffered some deprivation of due process as a result of a wide-ranging and poorly defined set of practices and polices.

B.     *Plaintiffs Have Failed to Satisfy the "Cohesiveness" Requirement of Rule 23(b)(2)*

Where the four prerequisites to class certification in Rule 23(a) are satisfied, a class may be maintained if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  By its terms, there are two separate elements to certification under this provision: first, the defendant's action must be "generally applicable" to the class as a whole; and, second, the plaintiffs must seek final injunctive or declaratory relief on behalf of the class.  *Disability Rights*, 239 F.R.D. at 28.  "By virtue of its requirement that the plaintiffs seek to redress a common injury . . . Rule 23(b)(2) operates under the presumption that the interests of the class members are cohesive."  *Lemon v. Int'l Union of Operating Engr's', Local No. 139, AFL-CIO*, 216 F.3d 577, 580 (7th Cir. 2000).  Accordingly, in order to maintain certification pursuant to Rule 23(b)(2), the proponent of certification must establish that the putative class is sufficiently cohesive to warrant class treatment.  *Id.*; *accord Romberio v. UnumProvident Corp.*,

385 Fed. App'x 423, 432 (6th Cir. 2009); *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1121 (8th Cir. 2005); *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 75 (S.D.N.Y. 2002); *Devaughn*, 594 F.3d at 1199.[12]  As a corollary to this principle, certification is generally inappropriate in actions raising significant individual liability or defense[13] issues.  *Agostino*, 256 F.R.D. at 450.  The Court shall now turn to various fractures within the class that, whether considered together or independently, fundamentally undermine Plaintiffs' ability to satisfy the "cohesiveness" requirement.

---

[12]  The "cohesiveness" requirement has not been fashioned by the courts *ex nihilo*, but rather is a direct and logical outgrowth of the requirement—embedded in the text of Rule 23(b)(2) itself—that the challenged action "apply generally to the class."  *Agostino*, 256 F.R.D. at 456; *see also Disability Rights*, 239 F.R.D. at 29 ("the assumption of cohesiveness for purposes of injunctive relief . . . justifies certification as a [Rule 23(b)(2)] class.").  Additionally, the "cohesiveness" requirement serves at least two critical functions: first, because unnamed members of a class certified pursuant to Rule 23(b)(2) typically do not have an opportunity to opt out of the action, members with valid individual claims may be unjustly bound by an adverse determination; and second, absent sufficient cohesiveness, actions would inevitably become so unmanageable that the primary purpose of the class action device—*i.e.*, advancing judicial economy and efficiency through class-wide treatment—would be destroyed.  *Barnes*, 161 F.3d at 142-43.  At the same time, district courts should avoid conflating the cohesiveness requirement under Rule 23(b)(2) with the predominance requirement under Rule 23(b)(3), though the two serve similar ends.

[13]  In assessing the cohesiveness of a putative class, the scope of the district court's inquiry is not limited to the claims asserted, but rather extends to the defenses that are actually, or may reasonably be expected to be, asserted in the course of the litigation.  *See Barnes*, 161 F.3d at 143 (taking into account the individual determinations required to resolve defenses of comparative and contributory negligence in a medical monitoring class action); *Romberio*, 385 Fed. App'x at 429 (reversing certification decision, and describing the district court's refusal to "look more closely at . . . the defenses that [defendant] might raise" as "puzzling").  Undoubtedly, district courts should be vigilant in ensuring that a defendant is not allowed to prevent the otherwise appropriate use of the class action device merely by injecting issues into the action that would require particularized determinations as to individual class members or subsets of the class.  At the same time, courts cannot turn a blind eye to the question of whether *bona fide* defenses likely to be interposed by the defendant counsel against proceeding as a class action certified under Rule 23(b)(2).

1.    Pre-Deprivation Notice Versus Post-Deprivation Notice

According to Plaintiffs' own data, out of a total of 642 terminations, 201 were unaccompanied by notice at any point, 144 were accompanied by notice after the termination of benefits, and 13 involved notice provided simultaneously with termination—a total of 358, or 55.8%.[14]  *See* Pls.' Ex. 665 (Spreadsheet: All Adverse Actions); Pls.' Ex. 666 (Spreadsheet: Adverse Actions with Notice).  This 55.8% of the known class constitutes the full universe of individuals claimed to have been denied pre-deprivation notice outright.  Meanwhile, 253 terminations—39.4%—received at least some pre-deprivation notice.[15]  There may be circumstances where a practice claimed to affect slightly more than half the class may support certification pursuant to Rule 23(b)(2), but this is not such a case.  These two groups were subjected to distinct injuries and practices, if they have suffered any injuries at all.  As described below, *see infra* Part IV.B.2, for the group that received some pre-deprivation notice, the viability of the asserted claims will turn on the question of how much advance notice was constitutionally required based upon the unique circumstances presented.  *See Lemon*, 216 F.3d at 580 ("cohesiveness" means that the action "will not depend on adjudication of facts particular to any subset of the class").  Viewed from a slightly different vantage point, absent

_____

[14]  The Court has endeavored to provide the most accurate figures in the course of its opinion today, but its numerical calculations should not be taken as anything more than approximions offered to provide some context for its decision.  Minor deviations, inaccuracies, or disagreements as to the relevant figures would not affect the Court's ultimate disposition.

[15]  The Court is aware that there is some disagreement among the parties as to the contours of the "pre-deprivation notice" category, a dispute that focuses in large part on the effect of mailing delays.  For ease of reference, if the date on the notice provided to the beneficiary preceded the cut-off of benefits by one or more days, the Court has placed the termination in the "pre-deprivation notice" category.  However, the Court emphasizes that its decision today does not turn on the ultimate classification of those terminations located on the borderline.

decertification, the Court would be left incapable of discerning from this record the "run-of-the-mine cases" from which to determine across-the-board liability. *Lightfoot*, 448 F.3d at 402 (Silberman, J., concurring).

Notably, this action does not involve the typical form of "final injunctive relief or corresponding declaratory relief" involved in class actions certified under Rule 23(b)(2). Fed. R. Civ. P. 23(b)(2); *see also Dukes*, 603 F.3d at 646 (Ikuta, J., dissenting) ("[H]istorical actions [animating Rule 23(b)(2)] sought the correction of a specific discriminatory policy affecting all members of the class in the same way."). Instead, the primary relief sought by Plaintiffs is an order requiring Defendants to create an administrative system for "reviewing class members' files on a case-by-case basis to determine whether individual class members received adequate pre-deprivation due process, and if not, allowing them the opportunity to have their claims reviewed with the benefit of due process." *Lightfoot*, 246 F.R.D. at 343. While this Court has rejected Defendants' contention that such relief cannot support certification under Rule 23(b)(2)—a decision it shall not revisit today—that does not mean that the nature of the relief sought is irrelevant to the propriety of continued certification. Indeed, the cohesiveness requirement is of particular import where, as here, the primary relief sought by the class is not a class-wide, universal injunction against a challenged practice—*e.g.*, an order precluding a municipality from using a testing procedure shown to have a disparate impact on a protected class of municipal employees—but rather is, although a form of equitable relief, essentially individualized in nature. In this case, were the class to prevail, each individual class member would be entitled to an individualized administrative review of his or her claimed entitlement to benefits. Nor is this a case where there is a modest number of members of the class falling

outside the scope of the challenged conduct; rather, if the class were to prevail, it is conceivable that a large number of individuals who were not deprived of due process (as determined by the factfinder) would be afforded relief to which they were not otherwise due.

2.  Terminations Accompanied by Pre-Deprivation Notice: Divergences in the Amount of Notice Provided

Among the myriad fissures in the class, perhaps the most glaring pertains to the amount of notice provided to beneficiaries.  Plaintiffs seek to aggregate all beneficiaries who received less than thirty days' pre-deprivation notice, including those beneficiaries who received no notice at any time and those who received notice simultaneously with the termination of benefits—that is, Plaintiffs seek to situate the "no notice" subgroup and the "inadequate notice" subgroup under the same umbrella.  Pls.' Summ. J. Mem. at 3; *see also* Pls.' Summ. J. Reply at 15 (suggesting that "the Court . . . should aggregate those who received no notice at all with those who received notice but an inadequate pre-deprivation opportunity to contest their terminations").  According to Plaintiffs, when the "no notice" and "inadequate notice" subgroups are lumped together, they comprise 85% of all terminations.  Pls.' Summ. J. Reply at 15.  However, as the following table illustrates, within the so-called "inadequate notice" subgroup, the amount of pre-deprivation notice provided is far from uniform:[16]

| No. of Days of Pre-Deprivation Notice | No. of Terminations | % of Terminations With Some Pre-Deprivation Notice |
|---|---|---|
| 1-5 days' notice | 56 | 22.1% |
| 6-10 days' notice | 27 | 10.7% |

---

[16]  For ease of reference, the table is divided into five-day periods, but the Court's analysis should not be taken as an indication that the designated periods have some inherent constitutional significance.

| | | |
|---|---|---|
| **11-15 days' notice** | 41 | 16.2% |
| **16-20 days' notice** | 32 | 12.6% |
| **21-25 days' notice** | 26 | 10.3% |
| **26-30 days' notice** | 19 | 7.5% |
| **31+ days' notice** | 52 | 20.6% |

Pls.' Ex. 666 (Spreadsheet: Adverse Actions with Notice).[17]  Roughly the same number of terminations were accompanied by somewhere between one and five days' pre-deprivation notice—22.1%—as more than thirty days' notice—20.6%.  *Id.*  Similarly, roughly the same number of terminations were accompanied by somewhere between six and ten days' pre-deprivation notice—10.7%—as twenty-one to twenty-five days' notice—10.3%.  *Id.*

The following table demonstrates the divergences among the class that would result if the Court were to evaluate whether terminations satisfied a specific threshold of pre-deprivation notice:

| No. of Days of Pre-Deprivation Notice | No. of Terms. | % of Total Terms. With Some Pre-Deprivation Notice |
|---|---|---|
| ≥ **5 days' notice** | 209 | 82.6% |
| ≥ **10 days' notice** | 178 | 70.4% |
| ≥ **15 days' notice** | 138 | 54.5% |
| ≥ **20 days' notice** | 97 | 38.3% |
| ≥ **25 days' notice** | 76 | 30.0% |

---

[17]  The Court considers it neither advisable nor necessary to resolve the parties' dispute over whether the amount of pre-deprivation notice should be calculated by using the beginning, as opposed to the end, of pay periods as the relevant cut-off date.  *See* Defs.' Summ. J. Opp'n at 26-28; Pls.' Summ. J. Reply at 17-18.  The Court only observes that, were Defendants' position to prevail, the propriety of continued certification would become even more circumspect.

| ≥ **30 days' notice** | 61 | 24.1% |

The point is not just that there is some observable difference among the "inadequate notice" subgroup; rather, a central—perhaps *the* central—question in this action is how much pre-deprivation notice was constitutionally required. And the problem is this—Plaintiffs readily concede that there is no definitive notice period supplied by *Mathews* or its progeny, Pls.' Summ. J. Reply at 21-22, and the viability of a large number of class members' claims may very well turn on the number of days' advance notice they were provided. *See Jones v. Flowers*, 547 U.S. 220, 226 (2006) ("[D]ue process requires the government to provide 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'") (quoting *Mullane*, 339 U.S. at 314); *cf. Machado v. Leavitt*, 542 F. Supp. 2d 185, 195 (D. Mass. 2008) ("[T]he length of a delay is only part of the due process analysis;" "[u]ltimately, the decision on liability will rest on a broad reasonableness determination."). In a world where five days' advance notice would suffice, approximately 82.6% of the terminations within the "inadequate notice" subgroup would not be "inadequate" at all. If ten days' notice would suffice, 70.4% of the subgroup would be excluded. These divergences may be of constitutional significance, and therefore undermine any suggestion that the class, as it is currently constituted, is sufficiently cohesive to proceed under Rule 23(b)(2).[18]

---

[18] For reasons stated in greater detail below, Plaintiffs' contention that a thirty-day pre-deprivation notice period should apply across the class is suspect. Here, the Court only adds that Plaintiffs have tendered a sweeping argument at the expense of an undeniably more persuasive argument for a large segment of the class. For example, nearly half of the "inadequate notice" subgroup would be better served by an argument that anything less than fifteen days' notice is constitutionally insufficient. *See Barnes*, 161 F.3d at 142-43 (absent cohesiveness, unnamed

3.    Terminations Accompanied by Notice: Divergences in the Amount of
      Notice Provided Based Upon the Reason for Termination

According to Plaintiffs, for terminations accompanied by some form of notice (regardless

of whether the notice came prior to, simultaneously with, or after the termination decision), the

average timing of the notice across groups was -2.7 days—*i.e.* benefits were cut off 2.7 days

*before* notice.  Pls.' Summ. J. Mem. at 3; Pls.' Ex. 666 (Spreadsheet: Adverse Actions with

Notice).  However, for those terminations accompanied by some form of notice, the amount of

notice provided varies considerably based upon the reason for the termination:

|  | Total No. | Average | Median |
|---|---|---|---|
| **Medical Improvement** | 227 | 8.2 | 12 |
| **Return to Work** | 95 | -26.5 | -3 |
| **Retirement** | 29 | 12 | -3 |
| **Death** | 13 | -77.5 | -41 |
| **Non-Cooperation** | 51 | 10.6 | 12 |
| **Other** | 26 | -6.1 | -5 |

Pls.' Ex. 666 (Spreadsheet: Adverse Actions with Notice).[19]

---

class members may be unjustly bound by an adverse determination).

[19]  Defendants maintain that Plaintiffs misclassify a number of terminations by, for
example, treating some return-to-work terminations as medical-improvement cases.  Defs.' Mem.
at 16.  For purposes of this motion, the Court considers it inappropriate to resolve the factual
dispute, and the Court accordingly assumes that Plaintiffs' classifications are correct.
Furthermore, while resolution of Plaintiffs' claim on the merits may require a closer look at the
individual circumstances of certain terminations to assess whether those terminations have been
properly classified, the number of misclassifications identified by Defendants is small, and the
resolution of such disputes appears far from insurmountable.  On another note, the Court also
observes that the figures of total terminations listed in the table include the approximately 31
terminations accompanied with some form of notice for which the record is unclear as to how
much notice was actually provided.

As the table illustrates, terminations based on the beneficiary's death, retirement, or return to work were generally accompanied by less advance notice than medical-improvement and non-cooperation terminations. These differences may very well be constitutionally significant. Indeed, although Defendants likely overreach in suggesting that the risk of erroneous deprivation in connection with death, retirement, and return-to-work terminations "is virtually nil," Defs.' Summ. J. Opp'n at 22, Plaintiffs concede that "the risk of termination error in these categories [*i.e.* death, retirement, and return-to-work] is likely somewhat lower than for other types of terminations," Pls.' Summ. J. Reply at 23. The factfinder may—indeed, must—take into account these relative levels of risk in determining what process is constitutionally due. Simply by way of example, if there is indeed less risk of an erroneous deprivation for terminations based on retirement, one might be more willing to conclude that an average of 12 days' pre-deprivation notice satisfies the constitutional command, but at the same time conclude that 12 days' pre-deprivation notice would not suffice in the context of medical-improvement terminations.

In the same vein, Plaintiffs readily concede that there is no definitive notice period supplied by *Mathews* or its progeny, but argue that "[g]iven the need to gather information to respond to a termination notice, and the high incidence of mailing delays and errors, a failure to afford a 30-day grace period implicates due process." Pls.' Summ. J. Reply at 21-22. Plaintiffs maintain that this thirty-day grace period should apply across the class, but the differences in these categories may affect the question of whether the notice actually provided was "reasonably calculated" to afford beneficiaries "an opportunity to present their objections." *Jones*, 547 U.S.

at 226 (internal quotation marks omitted).[20]  To illustrate, assume two erroneous termination

decisions—one based on medical improvement and the second based on the beneficiary's death.

There can be little doubt that the individual whose benefits were wrongfully terminated on the

basis of medical improvement would require more time to meaningfully respond to the

termination decision.  Such an individual, for example, might seek to consult with her treating

physician and prepare a response.  Presumably, presenting proof of life would be an easier task.

Concomitantly, there is reason to believe that it would require less time to remedy an erroneous

deprivation in certain categories.  *See Mathews*, 424 U.S. at 341 ("[T]he possible length of

wrongful deprivation of benefits . . . is an important factor in assessing the impact of official

action on the private interests") (internal notations and quotation marks omitted).  All these

divergences preclude the class from being sufficiently cohesive to support continued certification

under Rule 23(b)(2).  Similarly, all these differences prevent the Court from distilling "the run-

of-the-mine cases" from the diverse experiences of the class.  *Lightfoot*, 448 F.3d at 402

(Silberman, J., concurring).

    4.    <u>Terminations Made Without Any Pre-Deprivation Notice: Medical-Only
Beneficiaries Versus Wage-Replacement Beneficiaries</u>

According to Plaintiffs, whereas 86% of medical-only beneficiaries received no pre-

deprivation notice, only 15% of wage-replacement beneficiaries received no pre-deprivation

---

[20]  *Mathews* itself addressed a similar interest: the right to notice prior to the termination of Social Security disability payments.  *Mathews*, 424 U.S. at 323.  In reaching its decision, the Supreme Court noted that "[t]he principal reasons for benefits terminations are that the worker is no longer disabled or has returned to work."  *Id.* at 336.  The Court expressly limited its holding to the sufficiency of the procedures involved in addressing the termination of benefits where the recipient is no longer disabled, at least intimating that a different set of procedures might be required in other contexts.  *Id.*

notice.  Pls.' Summ. J. Mem. at 3.  Based on Plaintiffs' own interpretation of the data, therefore, the divergence between the two groups is evident: the vast majority of medical-only beneficiaries received no pre-deprivation notice, while the vast majority of wage-replacement beneficiaries did.  There is at least one reason why this divergence may be constitutionally significant.

Defendants argue that, by the very nature of the benefits at issue, the medical-only beneficiaries subgroup is more likely to include individuals who are no longer in need of continued benefits—in the Defendants' chosen parlance, individuals who "stopped needing to go to the doctor."  Defs.' Summ. J. Opp'n at 17.  Plaintiffs may very well be correct that beneficiaries approved for statutorily required medical-only benefits have a property interest in their benefits that is equally worthy of protection under the Due Process Clause as the interest held by wage-replacement beneficiaries.  Pls.' Summ J. Reply at 13.  Establishing a constitutionally protected interest, however, is only the beginning of the *Mathews* inquiry.  In determining what process is due, the factfinder must take into account, among other things, "the risk of erroneous deprivation . . . through the procedures used."  *Mathews*, 424 U.S. at 335.  As such, the difference in the composition of these two subgroups—specifically, the relative risk that a beneficiary would be erroneously deprived of benefits to a claimed entitlement—may impact the factfinder's determination as to what process was constitutionally due, again undermining the cohesiveness of the certified class.

5.      The Extension of Benefits Pending Reconsideration of Termination Decisions

Plaintiffs contend that "Defendants had a clear and consistently applied policy or practice of not continuing benefits through reconsideration review during the class period."  Pls.' Summ. J. Mem. at 19.  Out of a total of 642 total terminations, 411 were accompanied by some form of

notice.[21]  Pls.' Summ. J. Mem. at 9, 15; Pls.' Ex. 665 (Spreadsheet: All Adverse Actions); Pls.'

Ex. 666 (Spreadsheet: Adverse Actions with Notice).  Out of those 411 terminations

accompanied by some form of notice, there were 183 requests for reconsideration.  Pls.' Ex. 667-

A (Spreadsheet: Reconsideration Policies).  In other words, 44.5% of terminations that were

accompanied by notice and 28.5% of all terminations were followed by a request for

reconsideration.

Moreover, of the 183 requests for reconsideration, Plaintiffs acknowledge that 25 fall

outside this alleged practice for various reasons (*e.g.*, because the requests were untimely).  Pls.'

Summ. J. Mem. at 19 n.19.  According to Plaintiffs, of the remaining 158 relevant

reconsideration requests, 52—slightly less than one-third—actually received benefits during the

pendency of the reconsideration process.  Pls.' Ex. 667-A (Spreadsheet: Reconsideration

Policies).  Therefore, only 106—67.1% of those who requested reconsideration—allegedly

received no benefits throughout the reconsideration process.  Pls.' Summ. J. Mem. at 19, 55.[22]

That means that, according to Plaintiffs' characterization of the case files, only 25.8% of

terminations that were accompanied by some form of notice and 16.5% of all terminations were

---

[21]  The 411 figure includes notices that were sent before, simultaneously, and after the
termination of benefits—*i.e.*, it encompasses both pre- and post-deprivation notice—as well as
those terminations for which the timing is unclear.

[22]  Even within this group, Plaintiffs acknowledge a divergence in the rate at which
benefits were extended depending on the date the reconsideration request was made.  According
to Plaintiffs, 97% of beneficiaries requesting reconsideration prior to July 2002 were denied
benefits pending reconsideration, while 60% of those requesting reconsideration after July 2002
were denied such benefits.  Pls.' Summ. J. Mem. at 48.  That date has potential significance in
this action, as Plaintiffs maintain that, due in part to this litigation, the District instructed
CLW/CDM to provide notice of reconsideration extension benefits in or about July 2002.  *Id.* at
20.

subject to this alleged practice.

### 6.    Terminations Based on Independent Medical Examinations

Plaintiffs claim that Defendants' practice of relying upon reports prepared in connection with an independent medical examination ("IME") "exacerbated" other due process problems in their administration of the CMPA.  Pls.' Summ. J. Reply at 36.  More specifically, Plaintiffs assert that reliance on IME reports "increases the risk of erroneous termination because it excludes from consideration the opinions of treating physicians who are more familiar with the beneficiary and with the history of the injury."  Pls.' Summ. J. Mem. at 58-59.  At the same time, Plaintiffs suggest that the burden of adopting additional or substitute procedures—*e.g.*, instructing physicians to follow a standardized protocol, sharing the report with beneficiaries' treating physicians, and attaching the report to notices of termination—would have been minimal.  Pls.' Summ. J. Reply at 36-37.  The argument is that the systematic exclusion of relevant evidence is a "highly significant" consideration in the due process evaluation, Pls.' Summ. J. Mem. at 59 (citing *Carter v. Cleland*, 643 F.2d 1, 6 (D.C. Cir. 1980)), but Plaintiffs fail to fully acknowledge that, according to their own data, this alleged practice does not carry across the class.  Plaintiffs maintain that approximately 190 of the 232 medical-improvement terminations relied exclusively on one or more IME reports, Pls.' Stmt. of Undisputed Material Facts ("Pls.' Stmt."), Docket No. [506-30], ¶¶ 806-07, meaning that Plaintiffs' allegations extend only to slightly less than one-third of all terminations.  To the extent Plaintiffs are correct that Defendants' purportedly myopic reliance on IMEs is relevant to the overall due process analysis, it is only relevant to a confined subset of the class, and yet Plaintiffs offer no workable solution for confining any conclusions to that part of the class.

7.  Beneficiaries' Access to Case Files

In a similar vein, Plaintiffs claim that beneficiaries whose benefits were terminated based on reports prepared in connection with IMEs had a "vital" need to access their case files to contest their terminations, but Defendants had a practice during the class period of making case files functionally unavailable.  Pls.' Summ. J. Mem. at 23; Pls.' Stmt. ¶¶ 789-90.  In other words, Plaintiffs assert that, for this subgroup in particular, the inability to obtain access to their case files affected, in a constitutionally significant way, their "opportunity to be heard . . . in a meaningful manner."  *Mathews*, 424 U.S. at 333.[23]

However, according to Plaintiffs, there were a total of 206 terminations based, to some degree, on IME reports.  Pls.' Summ. J. Mem. at 23.  Of these, Defendants included the IME report with the notice of termination in 5 instances, leaving 201 instances in which beneficiaries might have wanted access to their case files to obtain the IME reports.  *Id.*  That figure is just 31.3% of all terminations.  Moreover, Plaintiffs do not actually contend that all 201 terminations were accompanied by an actual or effective denial of access.  Of the 201 terminations, Plaintiffs only identify 14 instances in which access was either denied outright, difficult, or untimely, or where beneficiaries were charged "exorbitant fees" to obtain copies.  Pls.' Stmt. ¶¶ 791-805.  Indeed, Plaintiffs concede that, "[a]s only a few files contain evidence regarding the class member's attempts to access his or her file, any showing on this point is necessarily limited."  Pls.' Summ. J. Reply at 33.  Based on Plaintiffs' own characterization of the data, it is clear that

_____

[23]  Plaintiffs also claim that Defendants never notified beneficiaries of their right to access case files.  Pls.' Summ. J. Mem. at 23.  To the extent these allegations are even relevant, *see Lightfoot*, 2007 WL 148777, at *7-8 (rejecting claim that notices failed to comport with due process by failing to advise claimants of their ability to access case files), they also are not generally applicable to the class.

the reach of these practices is severely circumscribed, and by seeking to have the practices imputed to the class as a whole, the cohesiveness of the class is undermined.

Furthermore, even as they are characterized by Plaintiffs in support of their motion for summary judgment, many of these 14 cases implicate highly individualized circumstances that are not conducive to across-the-board resolution. For example, Plaintiffs allege that one claimant—G.A.—requested access to her case file, but was told that the file would not be available for 11 days. Pls.' Stmt. ¶ 792. When G.A. requested that her file be made available at a more convenient location, she was told that it would not be available for another 6 days. *Id.* A second claimant—M.B.—received her case file the day prior to the date her reconsideration request was due. Pls.' Stmt. ¶ 794. Other claimants were denied access altogether, and one claimant was granted access but informed that copies would cost $1 per page. Pls.' Stmt. ¶¶ 798, 802. Yet another claimant was apparently provided her IME, but not the full file. Pls.' Stmt. ¶ 805. These experiences turn on unique facts, and the determination of what constitutional relevance they may have is not susceptible to categorical treatment.

8.      Plaintiffs' Authorities Do Not Require a Different Result

In this context as well, Plaintiffs again cite to a number of cases *seriatim*, with minimal, if any, explanation as to how they pertain to the specific facts of this case. A close inspection, however, reveals that Plaintiffs' authorities are not on point.

First, Plaintiffs' reliance upon *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280 (10th Cir. 1999), is somewhat perplexing. Plaintiffs, apparently in error, cite to a dissenting opinion in that case. Pls.' Opp'n at 36 n.13. The majority opinion quite clearly (and persuasively) upheld the district court's conclusion that the "diverse situations" of the class members—mentally and

developmentally disabled children in state custody alleging they were denied adequate therapeutic services—counseled against class certification. *Valdez*, 186 F.3d at 1289-90. Despite the plaintiffs' proffered "systemic" theory of commonality in that case, the court concluded that there was no one "constitutional claim common to all . . . putative class members." *Id.* at 1288 n.4. In short, nothing in the court's opinion undermines the notion that, to maintain certification under Rule 23(b)(2), the claims must relate to "application of a common policy." *Id.* at 1288 (internal quotation marks omitted).

Second, in *Sorenson v. Secretary of Treasury*, 752 F.2d 1433, 1438 (9th Cir. 1985), *aff'd*, 475 U.S. 851 (1986), the defendant objected to class certification on the grounds that some members of the class, having failed to meet a statutory requirement that they pursue a refund through administrative channels prior to bringing suit, were barred from seeking a refund in federal court. The court agreed that sovereign immunity would bar such refund actions, but found the argument irrelevant as the named plaintiff "no longer [sought] a class-wide refund." *Id.* at 1440. The defendant apparently did not raise, and the court did not address, the question of whether the challenged practice—the defendant's policy of withholding tax refunds owed to parents who have delinquent child support obligations—was "generally applicable" to the class.

Third, in *Alliance to End Repression v. Rochford*, 565 F.2d 975, 976 (7th Cir. 1977)—a thirty-three-year old opinion involving the certification of classes of individuals and organizations purportedly subject to an institutionalized course and pattern of unconstitutional intelligence-gathering—the court's discussion of the requirements of Rule 23(b)(2) consists of two unilluminating sentences. *Id.* at 979. In a case of more recent vintage, the same court characterized *Rochford* as a "relic," situating it within the now-abrogated approach of certifying

43

"across-the-board," "open-ended," or "ambulatory" classes challenging a litany of practices irrespective of the source of the plaintiffs' injuries. *Rahman v. Chertoff*, 530 F.3d 622, 626-27 (7th Cir. 2008).

Fourth, Plaintiffs cite *Donaldson v. Pillsbury Co.*, 554 F.2d 825 (8th Cir.), *cert. denied*, 434 U.S. 856 (1977), an employment discrimination action, for the noncontroversial proposition that mere factual variations between class members are not, on their own, sufficient to preclude certification. Pls.' Opp'n at 36 n.13. Meanwhile, the court expressly acknowledged that district courts retain the discretion to limit a class where the challenged practice is limited to a subset of the class, merely finding that under the circumstances in that case that the challenged practices "appear[ed] to be as broad as the class claimed." *Donaldson*, 554 F.2d at 832 n.6. The court's discussion, moreover, was directed towards the "typicality" prong; the court did not address whether the seven specific practices challenged in that action were "generally applicable" to the class under Rule 23(b)(2), which the court apparently assumed would be addressed on remand. *Id.* at 830-32. More recently, the same court has made it clear that class claims under Rule 23(b)(2) must meet a "cohesiveness" requirement. *See In re St. Jude Med.*, 425 F.3d at 1121.

Fifth, in *Griffin v. Burns*, 570 F.2d 1065 (1st Cir. 1978), the court upheld the district court's certification of a class of voters on an expedited basis. Every member of the class had his or her vote invalidated for the reason that it was cast by absentee or shut-in ballot. *Id.* at 1072-74. As such, they all shared the same complaint—*i.e.*, that the state violated their constitutional rights by invalidating such ballots where it had an established and open practice of authorizing their use. *Id.*

Sixth, in *Jones v. Goord*, 190 F.R.D. 103 (S.D.N.Y. 1999), the plaintiffs challenged the

practice of "double-celling" inmates at maximum security facilities as a violation of the Eighth Amendment. Although the defendants argued that inmate screening was done "on a case-by-case basis by different prison officials at different facilities," the court found—with minimal explanation—that the plaintiffs' allegations were sufficient to meet the "general applicability" requirement under Rule 23(b)(2), certifying the general class along with thirteen separate subclasses to correspond to each of the thirteen facilities at issue. *Id.* at 112-13. The operative class-wide question appears to have been whether a single practice (double-celling) indisputably applicable to all class members was constitutionally defective. There is no indication that the class members sought to challenge similar but distinct practices under the rubric of the Eighth Amendment—*e.g.*, placing inmates in common areas subjecting them to the same risks as double-celling (increased injury, disease, etc.)—that would be inapplicable to the class as a whole.

Finally, *Rodriguez v. Hayes*, 591 F.3d 1105 (9th Cir. 2010), if anything, undermines Plaintiffs' position. Responding to the defendants' contention that the class—aliens detained during immigration proceedings for more than six months without a bond hearing—suffered detention for different reasons and under the authority of different statutes, the court found that each class members' claim turned on a single question: whether an individual could be detained for over six months without a bond hearing under a statute that did not authorize detention for longer than that time. *Id.* at 1122-23. While the court held that certification under Rule 23(b)(2) is not *per se* precluded merely because "some class members may have suffered no injury or different injuries from the challenged practice," the court expressly provided that courts must "look at whether class members seek uniform relief *from a practice applicable to all of them*."

45

*Id.* at 1125 (emphasis added).

C.      *Additional Concerns About the Manageability of this Action as a Class Action Support the Conclusion that Continued Certification is Inappropriate*

In assessing whether a class action certified under Rule 23(b)(2) is the proper vehicle for the claims asserted, district courts may take into account questions as to the manageability and efficiency of proceeding as a class action. *See Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1019 n.111 (D.C. Cir. 1986) (providing, in dictum, that "manageability problems that might block a class action under Rule 23(b)(3) may be entailed as well in the Rule 23(b)(2) format."), *cert. denied*, 482 U.S. 915 (1987); *Shook v. El Paso Cnty.*, 386 F.3d 963, 973 (10th Cir. 2004) ("[T]he vehicle of class action litigation must ultimately satisfy practical as well as purely legal considerations."), *cert. denied*, 544 U.S. 978 (2005); *see also Agostino*, 256 F.R.D. at 469 (denying certification under Rule 23(b)(2) where proposed class was insufficiently cohesive to "preserve the efficiencies gained through class litigation").[24]  Based upon the totality of its experience in this litigation—most notably, the complicated and extended history of discovery— and having looked ahead to determine how certain issues might be addressed at trial, the Court is left convinced that the continued certification of the class will not advance the principal purpose of the class action device—*i.e.*, advancing "the efficiency and economy of the litigation." *Falcon*, 457 U.S. at 159.  A few examples—in addition to those outlined above—shall suffice.

First, Plaintiffs have argued that the reasons that Defendants provided for termination decisions were so "cursory" or "terse" that they were not "reasonably calculated to apprise the

---

[24]  The Court respectfully disagrees with the passing comment made by the court in *Forbush v. J.C. Penney Co., Inc.*, 994 F.2d 1101, 1105 (5th Cir. 1993), that "questions of manageability and judicial economy are . . . irrelevant to 23(b)(2) class actions."  Questions of manageability and efficiency are relevant to all class actions, albeit perhaps to differing degrees.

claimants of the action taken and afford them an opportunity to present their objections."  Pls.'

Summ. J. Mem. at 53 (citing *Mullane*, 339 U.S. at 315).  Plaintiffs offer only two illustrative

examples, *id.* at 53 (citing Pls.' Stmt. ¶¶ 101, 104), but approximately 253 terminations were

accompanied by some form of written pre-deprivation notice, Pls.' Ex. 666 (Spreadsheet:

Adverse Actions with Notice).  Notably, Plaintiffs do not contend that pre-deprivation notices

were identical in describing the reasons for termination.  Instead, in articulating their contention

that the notices did not reasonably apprise claimants of the basis for the decision, Plaintiffs

invariably couple a generality as to the contents of such notices with a generality as to their

frequency.  *See, e.g.*, Pls.' Stmt. ¶ 103 (short-form notice "usually [included] an extremely terse

explanation of the reasons for the action").  But elsewhere, Plaintiffs acknowledge

variation—potentially significant variation.  *See, e.g.*, Pls.' Summ. J. Mem. at 10 (acknowledging

that short-form notices "sometimes [included] an explanation couched in highly technical

medical language"); Pls.' Stmt. ¶¶ 114, 119-125 (describing non-standard notices).  With this

record, it is difficult to imagine how the question of whether the notices provided were

constitutionally adequate would be amenable to resolution on a class-wide basis; the

reasonableness determination would likely require the factfinder to take stock of the sufficiency

of each individual notice, and then determine what conclusions, if any, could be imputed to the

class as a whole.

Second, in support of their motion, Defendants offer fifteen case studies of class members

who received less than thirty days' notice in order to illustrate the problems associated with

continued class treatment.[25]  Defs.' Mem. at 31-35.  Mindful that Plaintiffs need not establish

constitutional violations for each and every class member in order prevail on their claim, the

Court is not oblivious to the fact that Defendants may legitimately raise the particulars of

individual cases in order to defend against the contention that violations occurred with sufficient

frequency "across the board."  *Lightfoot*, 246 F.R.D. at 341.  Stated differently, provided

Defendants can point to a sufficiently large subset of cases, the particulars of individual cases

may have some relevance in showing that the deficiencies in Defendants' policies were confined

to the "rare exceptions," and did not extend to the "generality of cases."  *Walters v. Nat'l Assoc.

of Radiation Survivors*, 473 U.S. 305, 321 (1985) (internal quotation marks omitted).  Therefore,

with the continued certification of the class, there is a risk that the trial in this action would

devolve into multiple mini-trials going to the propriety of Defendants' conduct as to individual

class members.

   Similarly, Plaintiffs characterize a host of factual disputes raised by Defendants in

opposition to Plaintiffs' motion for summary judgment as mere "quibbles."  Pls.' Summ. J. Reply

at 39.  Plaintiffs suggest that "[t]he notices and medical records speak for themselves, and the

---

[25]  Simply by way of example, Plaintiffs allege that one claimant—R.J.—received four days' written pre-deprivation notice.  Pls.' Ex. 666 (Spreadsheet: Adverse Actions with Notice). Defendants, however, suggest that the claims file for R.J. includes documentation memorializing conversations between R.J. and the claims examiner, which indicates that R.J. informed the claims adjuster that his treating physician released him to return to work as early as 47 days prior to the claimed cut-off of benefits and that he subsequently expressed his readiness to return to work.  *See* Defs.' Stmt. of Disputed Facts and Stmt. of Additional Material Facts in Opp'n to Pls.' Mot. for Summ. J., Docket No. [528], ¶ 354.  The Court mentions this case not to suggest that Defendants' characterization is meritorious—a determination that would needlessly stray from the proper domain of questions resolvable on a motion for class decertification—but rather to highlight how the broader class issues may turn on more discrete facts particular to individual class members.

Court need not parse through these minutiae." *Id.* at 39-40. Without resolving the issue, the Court is not convinced that the questions raised by Defendants can be characterized as mere "quibbles"—or, to translate Plaintiffs' objection into the idiom of the Federal Rules of Civil Procedure, that they relate solely to immaterial facts. Fed. R. Civ. P. 56(a). Regardless of whether the records "speak for themselves," Pls.' Summ. J. Reply at 40, the factfinder will likely need to parse through these materials to assess precisely what the records say and what their overall relevance is to the class.

These are but three examples of a whole host of problems this Court anticipates may reasonably arise were this action to proceed to the merits with the class in its present form. In light of its extended experience with the parties and the claims in this action, the Court concludes that the primary purpose of the class action device—*i.e.*, advancing judicial economy and efficiency through class-wide treatment—would not be served by the continued certification of the class.

## V. CONCLUSION

The Court is mindful that, by allowing claims to go forward that ordinarily may not be readily amenable to litigation, the class action device has proven to be an invaluable tool in litigating civil rights complaints and other claims involving systemic or widespread wrongdoing by government actors. That truism, however, cannot substitute for satisfying the strictures of Rule 23 of the Federal Rules of Civil Procedure. *See Agostino*, 256 F.R.D. at 454 (courts should not presume certification is appropriate merely because the plaintiffs' claims fall within a category of cases commonly certified). Indeed, despite being on notice for some time that there were substantial defects in the composition of the class, Plaintiffs elected to stand idly by and

forego attempts to remedy such defects. For the foregoing reasons, the Court concludes that

Plaintiffs can no longer meet the requirements for continued certification of the class.

Accordingly, the Court shall GRANT the District's [510] Second Motion to Decertify the Class.

The Court declines to reach Defendants' remaining arguments in favor of decertification. In

addition, because they are predicated, in whole or in part, upon the assumption of the continued

certification of the class, the Court shall DENY WITHOUT PREJUDICE various pending

motions by the parties. An appropriate Order accompanies this Memorandum Opinion.

Date:   January 10, 2011


_____
          /s/
**COLLEEN KOLLAR-KOTELLY**
United States District Judge